**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| SANTANA JOHNS, Individually | : | |
| and as the duly appointed Guardian | : | |
| of Robert Marcus Johns, an | : | |
| incapacitated adult, | : | |
| | : | |
|     Plaintiff, | : | |
| | : | |
| vs. | : | **CIVIL ACTION NO.:** |
| | : | **1:14-CV-125(LJA)** |
| CSX TRANSPORTATION, INC., | : | |
| | : | |
|     Defendant. | : | |

_____

**BRIEF IN SUPPORT OF DEFENDANT CSX TRANSPORTATION, INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Defendant CSX Transportation, Inc. ("CSXT") and submits the following Brief in support of its Motion for Summary Judgment.

**INTRODUCTION**

This case arises out of a nighttime collision between a 1999 Dodge Dakota pick-up truck driven by Marcus Johns and a CSXT train at the Anderson Memorial Church Road crossing ("AMC Crossing") in Fitzgerald, Ben Hill County, Georgia. Mr. Johns sustained serious personal injuries in the accident. In this action, Mr. Johns' wife, Santana Johns, seeks to recover damages from CSXT for his injuries.

The CSXT train involved in the accident was traveling westbound at a speed of 39 miles per hour, which was 21 miles per hour below the maximum authorized speed for that area. The train was burning its headlight on bright, its ditch lights were flashing, its bell was ringing, and the horn was sounding as the train approached the crossing.

Despite the numerous visual and audible warnings provided by the CSXT train, Marcus Johns failed to yield the right-of-way to the train as he was required to do by Georgia law and entered the crossing immediately before the train reached the crossing. The video of the accident captured from the front of the lead locomotive and photographs taken from AMC Road show that Mr. Johns had a clear view of the CSXT train as he approached the crossing.

The Plaintiff's Complaint and Amended Complaint allege numerous claims related to the AMC Crossing and the operation of the train.  The Plaintiff first contends that CSXT negligently failed to widen the AMC Crossing so that active warning devices (i.e., gates, lights, and bells) could be installed at the crossing and also failed to install active warning devices at the crossing.  These claims do not create a genuine issue of material fact because the authority and responsibility for widening the road and installing active warning devices, if determined to be necessary, was that of Ben Hill County, the governmental entity with jurisdiction over AMC Road.  CSXT was prohibited from taking either action without the authorization and direction of Ben Hill County.

The Plaintiff also contends that CSXT negligently failed to affix the stop sign on the same post as the crossbuck at the crossing.  This contention does not create a genuine issue of material fact because CSXT is not responsible for the location of the stop sign. The responsibility for locating or relocating the stop sign was that of Ben Hill County, not CSXT.  Therefore, CSXT cannot be held liable for failing to relocate the stop sign. Further, there is no evidence that the placement of the stop sign and crossbuck sign on separate posts was a proximate cause of the accident.

-2-

The Complaint also alleges that the CSXT train failed to effectively sound the horn as the train approached the crossing.  Federal law requires train horns to be sounded in a sequence of two long blasts, a short blast, and a long blast as the train approaches a public at-grade crossing.  In this case, the train crew sounded two long blasts and a final long blast.  While the Plaintiff may argue that the third blast did not comply with the regulation because it was longer than required, there is no evidence that the longer horn blast was a proximate cause of the accident.  In fact, the Plaintiff has submitted expert testimony that Mr. Johns could not hear the train horn – regardless of the pattern – inside his vehicle until immediately before the accident.

Further, the Plaintiff contends that CSXT negligently violated an internal speed restriction that required trains to be capable of stopping before reaching a crossing.  This claim fails to present a genuine issue of material fact for two reasons.  First, Plaintiff's claim misinterprets CSXT's internal rules.  The speed restriction at issue did not apply to CSXT's mainline track on which this train was traveling.  Further, this claim is preempted by federal law, which establishes the maximum authorized speed.  Even if CSXT was exceeding an internal speed restriction, it cannot be held liable unless the train was traveling faster than the maximum authorized speed.

The Plaintiff contends that the train crew failed to maintain a lookout as it approached the AMC Crossing.  The undisputed evidence shows that the crew was maintaining a lookout.  Further, there is no evidence that any failure to maintain a lookout played a role in this accident.  The train crew had a right to expect that Mr. Johns would yield the right-of-way to the CSXT train that was clearly visible and audible.  Once

Mr. Johns failed to yield and entered the crossing, there was nothing the train crew could have done to avoid the accident.

Finally, the Plaintiff claims that vegetation obstructed his view of the train.  The video from the lead locomotive, photographs, and witness testimony show that there was no obstruction of view caused by any vegetation along AMC Road.  Therefore, this claim should also be dismissed.

## **FACTUAL BACKGROUND**

### 1.    **The AMC Crossing**.

The subject accident occurred at the intersection of AMC Road and CSXT's mainline railroad track in Fitzgerald, Ben Hill County, Georgia.  (Doc. 1, ¶¶3, 7).  AMC Road is a county road that generally runs in a north-south direction.  (Deposition of Fred Day, p. 8; deposition of Michael Wesley Marsh, pp. 11, 16-17).  CSXT's mainline track runs generally in an east-west direction and intersects AMC Road at a slight angle. (Marsh dep., p. 11).  To the south of the crossing, AMC Road dead-ends at its intersection with Seaboard Road.  (Day dep., p. 8).

CSXT trains operated across the AMC Crossing on a regular basis throughout the day and night at the time of the accident.  Fred Day, who lives near the crossing, testified that he did not know exactly how many trains operated across the crossing each day, but that there were trains "constantly going in there, all day, all night, seven days a week." (Day dep., p. 9).   James Barnes worked the night shift at the American Blanching plant. (Deposition of James Barnes, p. 7).  He testified that trains operated across the crossing every fifteen to twenty minutes during the night shift.  (Barnes dep., p. 13).

A driver that turns onto AMC Road from Seaboard Road and proceeds north towards the crossing passes a stop sign, stop bar, and a railroad crossbuck sign before reaching the crossing.  (Exhibit 2 to deposition of Dillon Harrison; Day dep., pp. 10-11).  The stop sign is approximately 38 feet from the crossing and the crossbuck sign is approximately 17 feet from the near rail of the crossing.  (Deposition of Sean Alexander, p. 15; Deposition of Dillon Harrison, p. 15).  The stop bar is painted on the roadway adjacent to the stop sign.  (Exhibit 2 to Declaration of Dillon Harrison).

In the northeast quadrant of the crossing is the American Blanching plant.  (Day dep., p. 9).  This is where Marcus Johns worked.  (Deposition of James Barnes, p. 11; deposition of Santana Johns, p. 19). There are no buildings or other structures in the other quadrants of the crossing.  (Exhibits to Declaration of Dillon Harrison).  A driver proceeding north on AMC Road toward the crossing has an unobstructed view of CSXT's tracks, which are elevated above the roadway, to the east (driver's right).  (Day dep., pp. 13-14; exhibits 3, 4, 6, 7, 14, and 16 to Harrison Declaration; deposition of Bryan Robbins, p. 9; deposition of Michael Wesley Marsh, p. 28; exhibits to declaration of Warren Bond).  Fred Day, who lives near the crossing, tesified that you can see three or four miles from the stop sign and even further as you get closer to the crossing.  (Day dep., pp. 13-14; *see also* exhibits 3, 4, 6, 7, 14, and 16 to Harrison Declaration).  To the east of the crossing, CSXT's track is straight for several miles.  (Harrison dep., p. 45).

The Plaintiff has introduced evidence that in 2002, the Georgia Department of Transportation ("GDOT") wrote a letter to Ben Hill County regarding the AMC Crossing. The April 1, 2002 letter from GDOT State Traffic Safety and Design Engineer Phillip M.

Allen to the Honorable Larry Davis, the Ben Hill County Commission Chairman, stated that "the crossing qualifies for train activated railroad warning devices consisting of flashing lights, bells and gates."  (Exhibit 1 to deposition of Shelby Stevenson).  The letter further stated that the project could not be "developed" because the roadway was "substandard in width."  *Id.*  However, "if Ben Hill County will agree to widen the road to a minimum of twenty feet for 150 feet before each approach of the crossing, we can pursue our project."  *Id.*

The 2002 letter was copied to several GDOT employees and provided contact information for CSXT.  *Id.*  Notably, no one from CSXT was copied on the letter and there is no evidence that CSXT was aware of the information in this letter before the subject accident.  (Stevenson dep., pp. 52-54, 86, 88-94, 107).  In addition, the Ben Hill County roads director, county manger, and county commission chairman testified that they could not find a copy of the letter in Ben Hill County's files.  (Deposition of Timothy A. Kegebein, pp. 23-25; deposition of Frank Feild, pp. 24-31; deposition of Phillip C. Jay, III, pp. 17-30).

### 2.   The Accident.

The accident at issue occurred on August 12, 2013 at approximately 1:09 a.m. (Doc. 1, ¶3).  Marcus Johns worked the night shift from 7:00 p.m. to 7:00 a.m. at the American Blanching plant in the northeast quadrant of the crossing.  (Johns dep., pp. 19-20).  Mr. Johns used the crossing on a daily basis to go to and from work.  *Id.* at pp. 20-21, 27-29.  He would also use the crossing during his lunch break when he would typically go home to eat.  *Id.* at pp. 26-29.  Mr. Johns and his wife had previously

discussed the importance of stopping at the stop sign at the AMC Crossing.  *Id.* at p. 42.

Mr. Johns was returning to the American Blanching plant following his lunch break in his

1999 Dodge Dakota pick-up truck when the accident occurred.  *Id.* at pp. 32-36.

The CSXT train was operated by engineer M.W. McDonald.  Also in the cab of

the lead locomotive was conductor R.K. Weeks.  As the train approached the AMC

Crossing, the headlight on the lead locomotive was burning on bright, the ditch lights

were flashing,[1] the horn was sounding, and the bell was ringing.  (Exhibits 1, pp. 4-6, and

2 to Peterson deposition).  The train was traveling at a speed of approximately 39 miles

per hour.  (Doc. 15, ¶1; exhibit 1, p. 4 to Peterson dep.).  The train had been traveling at a

higher rate of speed but was in the process of decelerating for a CSXT speed restriction of

25 miles per hour in the City of Fitzgerald.  (Deposition of M.W. McDonald, pp. 9-11;

Deposition of R. K. Weeks, p. 15; Peterson dep., p. 4).

The crew testified that as the train approached the crossing, they saw a vehicle

drive across the crossing from left (south) to right (north).  (McDonald dep., pp. 9-10, 17;

Weeks dep., p. 6).  Both crew members watched the vehicle then turn right into the

American Blanching parking lot.  (McDonald dep., pp. 9-10, 17; Weeks dep., pp. 6, 16-

17).  They then focused on a car that was pulling out of the American Blanching parking

lot.  *Id.*  The engineer blew the horn more than usual to attempt to warn the vehicle

---

[1]The headlight is located near the top of the locomotive and can be seen in the
photographs in the record taken by Warren Bond.  The ditch lights are two lights located
near the center of the locomotive on the outer edges that flash on and off when the
locomotive horn is sounded.  The headlight and ditch lights provide a distinctive
triangular pattern specifically designed to make trains conspicuous to motorists and other
users at grade crossings.  (Exhibit 1 to Peterson deposition, p. 6).

pulling out of the parking lot.  (McDonald dep., pp. 9-10, 18).  Because both the engineer and conductor were watching the cars to the right of the crossing, neither crew member saw Mr. Johns' car, which came from their left, before the accident.  (McDonald dep., p. 22; Weeks dep., p. 18).  Following the impact, the crew believed they had hit something or bottomed out the train on the crossing.  (McDonald dep., p. 10; Weeks dep., pp. 18-19).  They brought the train to a stop following the accident through a service application of the train's brakes.  (McDonald dep., p. 31).

The accident was captured by a digital video recorder on the front of the lead locomotive.[2]  The video confirms that the train was traveling at 39 miles per hour and the horn was sounded in a series of four blasts beginning approximately 23 seconds before the accident.  The video also confirms the crew's testimony that a vehicle drove over the crossing before Mr. Johns' vehicle and that there was a car pulling out of the American Blanching parking lot.  (LDVR 00:26).  Approximately two to three seconds before the accident, the headlights of Mr. Johns' truck are visible to the south of the crossing.  (LDVR 00:33).  At this point in time, Mr. Johns was well short of reaching the crossing and had an unobstructed view of the train, which was less than 200 feet from the crossing.  *Id.  See also* screen shot attached to Wildharber Declaration showing that Mr. Johns had unobstructed view of the train.  Mr. Johns did not stop or slow down as he drove into the path of the train.  (LDVR 00:36).

---

[2]The LDVR video and instructions for viewing the video are attached to the Declaration of Joshua Wildharber, which has been manually filed with the Clerk of Court.

-8-

## STANDARD OF REVIEW

Summary judgment is proper where the moving party demonstrates that "there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the party seeking summary judgment demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify evidence that shows that a genuine dispute exists as to material facts. *Celotex v. Catrett*, 477 U.S. 317 (1986).

"When the moving party has carried his burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts....Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## PLAINTIFF'S CLAIMS

Plaintiff Santana Johns brings this lawsuit individually and as the duly appointed guardian of her husband Robert Marcus Johns for injuries he sustained in the accident. Plaintiff's claims against CSXT can be summarized as follows:

(1)     CSXT allegedly breached its duty to maintain the AMC Crossing under

O.C.G.A. §32-6-190 by failing to widen the crossing prior to the accident (Doc. 1, ¶¶16-20);

(2)     CSXT allegedly failed to warn motorists of the approaching train by:

(a)     failing to install active warning devices at the AMC Crossing (Doc. 1, ¶21);

(b)     failing to sound the train's horn (Doc. 1, ¶21);

(c)     failing to install a stop sign and crossbuck sign on the same post in compliance with the *Manual on Uniform Traffic Control Design* ("MUTCD") (Doc. 1, ¶21);

(d)     failing to comply with a special instruction regarding train speed in CSXT's timetable (Doc. 15, ¶¶2-3);

(e)     failing to maintain a lookout as the train approached the crossing (Doc. 15, ¶3); and

(f)     failing to maintain vegetation in the southeast quadrant of the crossing (Doc 1, ¶22); and

(3)     Plaintiff is entitled to punitive damages.  (Doc. 1, ¶30).

For the reasons set forth below, none of the Plaintiff's claims present a genuine issue of material fact for trial.  In addition, summary judgment should be granted because Marcus Johns' negligence in failing to detect the CSXT train that was clearly visible and audible was the proximate cause of the accident.

## ARGUMENT

I.     **Under Georgia law, CSXT cannot be held liable for failing to install active warning devices or widen the crossing.**

A.     **The Georgia Code of Public Transportation.**

The Plaintiff alleges that CSXT can be held liable for failing to install active warning devices and for failing to widen the crossing for the installation of active warning devices.  (Doc. 1, ¶¶16-21).  Neither of these claims present a genuine issue of material fact because CSXT was not responsible for taking either action.  Instead, the

responsibility for installing active warning devices and widening AMC Road was vested in Ben Hill County by the Georgia Code of Public Transportation ("GCPT"), O.C.G.A. §32-1-1, et. seq.

The GCPT defines the responsibilities of the governing authority with jurisdiction over the road and CSXT at the AMC Crossing.  The GCPT was enacted in 1973 to revise, classify, consolidate, and repeal other laws relating to all public roads and bridges, and to establish new laws relating thereto.  *Kitchens v. CSX Transportation*, 265 Ga. 206, 207 (1995).  The stated purpose of the GCPT "is to provide a code of statutes for the public roads and other transportation facilities of this state, the counties, and municipalities of Georgia.  The legislative intent is to provide an effective legal basis for the organization, administration, and operation of an efficient modern system of public roads and other modes of transportation."  O.C.G.A. §31-1-2.

The GCPT places broad duties upon counties with respect to "public roads," such as AMC Road, that are part of the county road system.  In pertinent part, O.C.G.A. §32-4-41 provides as follows:

> A county shall plan, designate, improve, manage, control, construct, and maintain an adequate county road system and shall have control of and responsibility for all construction, maintenance, or other work related to the county road system.

The GCPT further provides as follows regarding the responsibility for placement of traffic control devices on county roads:

> In conformity with the uniform regulations of the department: (1) counties and municipalities shall place and maintain upon the public roads of their respective public road systems such traffic-control devices as are necessary to regulate, warn or guide traffic except that counties and municipalities

also shall erect and maintain a sign for each railroad crossing at grade on
their respective county road or municipal street systems, warning motorists
of such crossing.

O.C.G.A. §32-6-50(c); *Purvis v. Virgil Barber Contractor*, 205 Ga. App. 13 (1992)

(holding that contractor had no duty to install warning sign on county road without

receiving direction from the county to do so).

The scope of the county's responsibility for AMC Road is further defined by the

meaning given the term "public road" by the GCPT.  "Public road" is broadly defined as

not just the road itself, but also includes eighteen other categories of structures, facilities,

appurtenances, and rights.  O.C.G.A. §32-1-3(24).  Of particular relevance to this case is

the inclusion of "railroad grade crossings" and "signs, signals, markings, or other traffic

control devices" within the meaning of "public road."  Section 32-1-3(24)(h) and (j).

The Plaintiff is attempting to hold CSXT liable for failing to install active warning

devices and widening AMC Road.  This effort should be rejected because these activities

are clearly the responsibility of Ben Hill County under the GCPT.

**B.      The GCPT delegates exclusive responsibility for installing protective
devices on AMC Road to Ben Hill County**.

The GCPT delegates exclusive responsibility for the installation of protective

devices on a public road to the governmental entity with jurisdiction over the road.

O.C.G.A. §32-6-200, which is titled "Installation of Protective Devices at Grade

Crossings," provides:

Whenever, in the judgment of the department in respect to the state
highway system, a county in respect to its county road system, or a
municipality in respect to its municipal street system, such protection is
reasonably necessary for the traveling public, the department or the county

-12-

or the municipality may order the protection of a grade crossing by the installation of protective devices.

In this case, Ben Hill County had the exclusive authority to order the installation of protective devices at AMC Road. O.C.G.A. §32-6-200(a); see also §32-6-50(c). Prior to installation, the plans and specifications for the protective devices must be approved by GDOT. *Id.* After the protective devices have been ordered and approved by the governmental entities, the railroad has a duty to install the devices in accordance with the approved plans and specifications. *Id.* In order for the governmental entity to carry out its responsibilities at grade crossings, the GCPT requires the railroad to allow the governmental entity temporary access to its right-of-way during the "construction or maintenance of...any grade crossing or protective device." O.C.G.A. §32-6-196.

Not only does the GCPT place exclusive responsibility for the decision to install protective devices in the governmental entity responsible for the road, but it makes it unlawful and a public nuisance for any person to erect, place, or maintain any unauthorized sign, signal, or other device within the right-of-way of any public road. O.C.G.A. §32-6-51(a) and (c); *Purvis, supra.*

In *Evans Timber Co. v. Central of Georgia Railroad Co.*, 239 Ga. App. 262 (1999), the Court of Appeals, in a full court opinion, held that the above provisions of the GCPT precluded a state common law claim against a railroad company for failure to install protective devices. "The GCPT precludes a common law cause of action against a railroad for the failure to install adequate protective devices at a grade crossing on a

-13-

public road when the railroad has not been requested to do so by the appropriate governmental entity." *Id.* at 266.

In *CSX Transportation, Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788 (11th Cir. 1999), the 11th Circuit considered whether a railroad had a duty under Georgia law to install warning devices at railroad crossings. Relying on *Evans Timber Company*, the 11th Circuit held: "We are convinced that the district court correctly ruled that §§32-6-50 and 32-6-51(a) of the GCPT statutorily overrule the state common law cause of action against railroads for negligent failure to install adequate warning devices at public grade crossings." *Id.* at 792.

In *Bentley v. CSX Transportation, Inc.*, 437 F. Supp. 2d 1327 (N.D. Ga. 2006), the district court analyzed the GCPT and agreed with *Evans Timber Company* and *Trism* that "the GCPT precludes a claim against a railroad for failure to install protective devices at grade crossings on public roads." *Id.* at 1332.

*Evans Timber Company* and *Trism* control the Plaintiff's claim against CSXT for negligently failing to install protective devices at the AMC Crossing. Ben Hill County was clearly responsible for ordering the installation of protective devices and there is no evidence that it directed CSXT to do so prior to the accident. Therefore, CSXT cannot be held liable and Plaintiff's claim should be dismissed as a result.

C. **The GCPT delegates responsibility for widening AMC Road to Ben Hill County.**

The GCPT also precludes the Plaintiff's claim that CSXT can be held liable for failing to widen AMC Road. Ben Hill County has the broad responsibility under the

GCPT for "construction, maintenance, or other work related to the county road system."

O.C.G.A. §32-2-41(1).  At public railroad crossings, the railroad is responsible for

"maintenance" of the crossing and the governmental entity is responsible for

"construction."  O.C.G.A. §32-6-190.  The GCPT defines "construction" as:

> The paving, striping, re-striping, modifying for safety purposes, grading,
> widening, relocation, reconstruction, or other major improvements of a
> substantial portion of an existing public road together with all activities
> incident to any of the foregoing.

O.C.G.A. §32-1-3(6).  "Maintenance," on the other hand, is narrowly defined as "the

preservation of a public road, including repairs and resurfacing not amounting to

Construction as defined in this Code Section."  O.C.G.A. §32-1-3(15).  Thus, the

railroad's duties at a public crossing are limited to "preservation" of the crossing "not

amounting to Construction."

In *Evans Timber Company*, the court held that these definitions of "construction"

and "maintenance" define the scope of the duties of the governmental entity and the

railroad at a public at-grade crossing.  239 Ga. App. at 265-66.  Relying in part on the

GCPT's narrow definition of "maintenance," the Court held that the railroad's duties did

not include the duty to install active warning devices unless it was directed to do so by the

governmental entity.  *Id.*

More recently, the United States District Court for the Northern District of

Georgia considered whether the relocation of active warning devices on a state highway

to a location closer to the crossing after changes were made to the crossing was the

responsibility of GDOT or CSXT.  The court conducted a thorough review of the GCPT

and held that the Plaintiff's claim against CSXT was precluded by the GCPT because relocation of the devices amounted to "construction" rather than "maintenance:"

> Therefore, the Court finds that the GCPT includes railroad grade crossings and the protective devices thereon in its definition of public road. Thus, the relocation of such protective devices constitutes construction of a portion of that public road. Because such a project constitutes "construction" and not "maintenance" under the GCPT, the GCPT places the responsibility for such a project on GDOT. Accordingly, the GCPT precludes a common law cause of action against CSX for the failure to relocate protective devices and thereby modify a railroad grade crossing on a public road where the railroad has not been requested to do so by GDOT.

*Long v. CSX Transportation, Inc.*, Case No. 1:13-CV-00990-ODE, p. 21 (N.D. Ga. April 10, 2015), a copy of the opinion is attached as Exhibit A.[3]

The reasoning and holdings in *Evans Timber Company* and *Long* are directly applicable to Plaintiff's claim that CSXT negligently failed to widen the road. CSXT cannot be held liable for not widening the AMC Road crossing because Ben Hill County has this responsibility and CSXT is prohibited from taking such action. *See Mercer v. Braswell*, 140 Ga. App. 624, 629 (1979) ("One cannot be charged with negligence in failing to do that which was not within his power to accomplish.").

The GCPT is clear that CSXT's responsibility is limited to "maintenance" of the grade crossing. O.C.G.A. §32-6-190; *Evans Timber Company*, 239 Ga. App. at 266; *Long*, p. 21. This responsibility only amounts to "preservation" of the roadway "not amounting to Construction." O.C.G.A. §32-1-3(15). On the other hand, Ben Hill County has responsibility for all "construction" related to the crossing, which specifically

_____

[3]The Plaintiff in *Long* has appealed Judge Evans' Order granting summary judgment in favor of CSXT. The appeal has been fully briefed by the parties.

includes "widening" and "modifying for safety purposes."  O.C.G.A. §32-1-3(6).

Because the responsibility for widening the crossing is specifically allocated to Ben Hill

County, the GCPT precludes a common law claim against CSXT for the alleged failure to

widen the crossing for the installation of protective devices.

> **D.     There is no evidence that CSXT was directed to install protective devices or widen the crossing prior to the accident.**

Finally, there is no evidence that CSXT received direction from Ben Hill County

or GDOT to widen the crossing or install protective devices prior to the accident.  In fact,

the evidence is undisputed that CSXT was not aware of the communication between Ben

Hill County and GDOT that allegedly occurred in 2002.  (Stevenson dep., pp. 52-54, 86,

88-94, 107).   Therefore, CSXT cannot be held liable for allegedly failing to widen the

crossing or install active warning devices.

**II.     CSXT's technical non-compliance with the Federal Horn Regulation was not a proximate cause of the accident.**

CSXT's train sounded four horn blasts as it approached the AMC Crossing.  The

first blast was sounded 23 to 24 seconds before the crossing and lasted 2.4 seconds.

(Deposition of Foster Peterson, pp. 21-22).  The second blast was sounded 16 to 17

seconds before the crossing and lasted 2.4 seconds.  *Id.* at p. 22.  The third blast was

sounded 9 to 10 seconds before the crossing and lasted 3.1 seconds.  *Id.*  Finally, the

fourth blast was sounded 2 to 3 seconds before the crossing and lasted 3.6 seconds.  *Id.* at

pp. 22-24.  The LDVR video confirms that the horn was being blown as the train

occupied the crossing.  (LDVR 00:36).

49 C.F.R. §222.21(a) provides that the "sounding of the locomotive horn with two long blasts, one short blast, and one long blast shall be initiated at a location so as to be in accordance with paragraph (d) of this section and shall be repeated or prolonged until the locomotive occupies the crossing."  Section 222.21(b)(2) provides:

> The locomotive horn shall begin to be sounded at least fifteen seconds, but no more than twenty seconds before the locomotive enters the crossing.  It shall not constitute a violation of this section if, acting in good faith, a locomotive engineer begins sounding the locomotive horn not more than 25 seconds before the locomotive enters the crossing, if the locomotive engineer is unable to precisely estimate the time of arrival of the train at the crossing for whatever reason.

The train horn regulation does not contain any requirements for the duration of a long blast or short blast or the gaps between blasts.  (Peterson dep., pp. 24-26).  CSXT's expert Foster Peterson and CSXT System Road Foreman[4] Steve Ammons testified that a long blast is longer than a short blast and a short blast is shorter than a long blast. (Peterson dep., pp. 24-25; deposition of Steve Ammons, p. 46); *see also Byrne v. CSX Transportation, Inc.*, 2012 WL 1965781 (N.D. Ohio 2012) (holding that 1 second and 2 second horn blasts constituted long blasts because they were longer than the short blast). Peterson and Ammons also testified that each of the horn blasts in this case were long enough to constitute a long blast.  (Ammons dep., pp. 49-50, 56; Peterson dep., pp. 24-25).

The sounding of the horn by engineer McDonald indisputably complied with the train horn regulation in all respects except the third blast, which Plaintiff will likely argue

---

[4]Road foremen supervise CSXT's engineers.  Ammons is the supervisor for all CSXT road foremen.

violated Section 221.21(a) because it was not sufficiently "short."  In that regard,

Engineer McDonald testified that he blew the horn for a longer time period on the third

blast because of the cars to the right (north) of the crossing.  (McDonald dep., pp. 9-10).

Whether or not this amounts to some technical non-compliance with Section 221.21(a)'s

pattern requirement,[5] there is no evidence that any alleged non-compliance was a

proximate cause of the Plaintiff's accident.

Other federal courts have granted summary judgment for the railroad in similar

circumstances where there was an alleged minor deviation from the requirements of

Section 222.21, but no evidence that the alleged deviation caused the accident.  In

*Eubanks v. Norfolk Southern Railway Co.*, 875 F. Supp. 2d 893 (N.D. Ind. 2012), the

horn sequence began approximately 21 seconds before the crossing and consisted of three

short blasts and one long blast.  The court held that even if a jury could find that the

sounding of the horn was not in compliance with Section 222.21, "no reasonable jury

could find on this record that the required longer blasts issued at 21 seconds before the

intersection and 10 seconds before the intersection (the approximate times of the short

blasts) would have changed the outcome of the incident."  *Id.* at 904.

In *Byrne v. CSX Transportation, Inc.*, 2012 WL 1965781 (N.D. Ohio 2012), the

locomotive engineer sounded four blasts beginning approximately 17.7 seconds before

the crossing.  The first blast lasted one second, followed by seven seconds of silence.  The

---

[5]If there is compliance with the horn regulation, any claim that the horn was not sounded
effectively is preempted.  *Alfaro v. Nat'l R. Passenger Corp.*, 553 Fed. Appx. 446, 448
(5th Cir. 2014).

second blast lasted two seconds, followed by 1.7 seconds of silence.  The third blast

lasted for .9 seconds and the final blast lasted 4.6 seconds.  *Id.* at *2.

      The court granted summary judgment in favor of the railroad for two reasons.

First, the court held that the horn sequence complied with Section 222.21 because all of

the long blasts – including blasts of 1 second and 2 seconds – were longer than the short

blasts.  *Id.*  Second, and most importantly for this motion, the court held that there was no

evidence that any deviation from the pattern was a proximate cause of the accident.  *Id.* at

*2-3.

      Finally, in *Stonebarger v. Union Pacific Railroad Co.*, 76 F. Supp. 3d 1228 (D.

Kan. 2015), the plaintiff alleged that the horn was only sounded for 13.7 seconds instead

of the required 15 seconds.  The court granted summary judgment, holding that there was

no evidence that the sounding of the horn 1.3 seconds after it was required was a

proximate cause of the accident.  *Id.* at 1246-47.

      These cases demonstrate that not only must the plaintiff show a deviation from the

requirements of Section 222.21, but the plaintiff must also show that the deviation was a

proximate cause of the accident.  *See also, e.g.,  Johnson v. Am. Nat'l Red Cross*, 276 Ga.

270, 273 (2003) ("Negligence is not actionable unless it is the proximate cause of the

injury. A wrongdoer is not responsible for a consequence which is merely possible[.]").

The only possible alleged deviation from the requirements of Section 222.21 was that the

third blast was a longer blast than required.  If anything, this means that motorists near the

AMC Crossing, including Mr. Johns, received more horn closer to the crossing than

required by Section 222.21.  Under such circumstances, Plaintiff cannot show that the

alleged deviation caused the accident, i.e., that if Mr. Johns had been provided less horn he somehow would have avoided being struck.  *See, e.g., Eubanks, supra*.

Moreover, the Plaintiff, if allowed, intends to offer expert testimony from Rudolf Mortimer, Ph.D. that it is unlikely that Mr. Johns could have heard the train horn until immediately before the accident, regardless of the pattern that was being blown.  (Exhibit 1 to deposition of Rudolf Mortimer, p. 3).  Therefore, according to Plaintiff's own evidence,  it is irrelevant and immaterial whether the proper pattern was blown or the horn was blown at all.  *See, e.g., Petre v. Norfolk S. Corp.*, 260 Fed. Appx. 756, 762 (6th Cir. 2007) (rejecting horn claim in part because expert opined that plaintiff "likely would have been unable to hear the whistle" at the point the defendants allegedly failed to sound it).  The Plaintiff has not, and cannot, show that this accident was caused by any alleged technical noncompliance with Section 222.21.

**III.     CSXT cannot be held liable for the placement of the stop sign**.

The Plaintiff alleges that CSXT was negligent because the stop sign to the south of the crossing was not affixed to the crossbuck as required by the MUTCD.  (Doc. 1, ¶21).  Georgia law requires CSXT to install crossbuck signs at every public crossing.  O.C.G.A. §32-6-50(c)(2).  The placement and maintenance of all other signs on public roads is the responsibility of the governmental entity with jurisdiction over the road, in this case Ben Hill County.  *Id.*  Further, it is "unlawful" for any person to remove, deface, or damage in any way any official traffic control device lawfully erected or maintained pursuant to this code section or any other law.  O.C.G.A. §32-6-50(d); see O.C.G.A. §32-6-51.

CSXT was not responsible for the location of the stop sign prior to the accident. Not only was CSXT not responsible for the location of the stop sign, but it would have been unlawful for CSXT to have relocated the stop sign without being directed to do so by Ben Hill County.  O.C.G.A. §32-6-50(d) ("It shall be unlawful for any person to remove, deface, or damage in any way any official traffic-control device lawfully erected or maintained pursuant to this Code Section or any other law.").  Therefore, CSXT cannot be held liable for the alleged negligent placement of the stop sign on a separate post from the crossbuck sign.[6]

## IV.   Plaintiff's claim that CSXT failed to comply with its timetable is factually incorrect and, in any event, preempted.

Plaintiff claims that CSXT was negligent for failing to comply with an instruction in its timetable.  (Doc. 15, ¶¶2-3).  Plaintiff's claim should be dismissed for two reasons.  First, the instruction at issue does not apply to trains on CSXT's mainline, but instead to industry tracks in the Fitzgerald area.[7]  Second, even if the timetable instruction applied to the mainline, Plaintiff's claim would be preempted by federal law.

Plaintiff alleges that CSXT's timetable required trains operating near AMC Crossing to operate at a speed of 15 miles per hour or less and be prepared to stop as they approached public crossings.  (Doc. 15, ¶¶2-3; the relevant portion of the timetable is attached as exhibit 1 to McMinn dep.).  However, every CSXT employee who has been questioned on this subject has testified that the special instruction at issue did not apply to

---

[6]In addition, there is no evidence that the placement of the stop sign on a separate post caused or contributed to this accident.

[7]The accident occurred on the CSXT mainline.

the mainline through Fitzgerald, but to local industry tracks in the area.  (Ammons dep., p. 22; deposition of Jeff McMinn, pp. 34-60; deposition of Ronald Brumfield, pp. 56-67). CSXT's expert Foster Peterson also confirmed that the instruction did not apply to mainline traffic.  (Exhibit 1 to Deposition of Foster Peterson, pp. 7-8).  Instead, CSXT's timetable and federal law allowed trains to operate up to 60 miles per hour on the mainline at the AMC Crossing.  (Ammons dep., p. 22; exhibit 1 to Peterson dep., p. 4). The train involved in this accident was traveling at 39 miles per hour, well below the timetable speed.  (Ammons dep., p. 22; exhibit 1 to Peterson Dep., p. 4).

Even assuming for the sake of argument that the special instruction in CSXT's timetable applied to trains on CSXT's mainline, Plaintiff's claim would be preempted by federal law.  49 C.F.R. §213.9 establishes maximum authorized speeds for different classes of track.  In *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 670 (1993), the Supreme Court held that any state law claim based on a train's allegedly excessive speed is preempted by Section 213.9 so long as the train is traveling below the maximum authorized speed.  *Id.* at 676.  Further, any claim that a train exceeded the speed set out in the railroad's timetable, but was traveling below the maximum authorized speed under Section 213.9, is also preempted.  *Michael v. Norfolk Southern Railway Co.*, 74 F.3d 271, 273-74 (11th Cir. 1996) (holding that state law claim that railroad violated its own internal speed regulation was preempted); *Hesling v. CSX Transportation, Inc.*, 396 F.3d 632, 637-38 (5th Cir. 2005) (same); *St. Louis Southwestern Railway Co. v. Pierce*, 68 F.3d 276, 278 (8th Cir. 1995) (same).

-23-

Here, CSXT's mainline track near the AMC Crossing was Class 4 track.  (Exhibit 1 to Peterson Dep., p. 4).  Class 4 track has a maximum authorized speed of 60 miles per hour.  *Id.*; 49 C.F.R. §213.9(a).  The train involved in this accident was traveling at 39 miles per hour immediately before the accident.  *Id.*  (Exhibits 1, p. 4, and 2 to Peterson dep.).  Therefore, Plaintiff's claim that CSXT negligently exceeded an internal speed restriction in its timetable is preempted by federal law.

**V.     CSXT's train crew properly maintained a lookout.**

Plaintiff claims that the CSXT train crew failed to maintain a proper lookout as it approached the AMC Crossing.  (Doc. 15, ¶3).  The Plaintiff's claim is based on the testimony of the engineer and conductor that they did not see Mr. Johns' truck before the accident.

Plaintiff's claim should be dismissed because the evidence shows that the train crew was maintaining a lookout despite the fact that they did not see Mr. Johns' truck.  Both crew members testified that they were looking ahead as they approached the crossing.  (McDonald dep., pp. 9-10, 17; Weeks dep., pp. 6, 16-17).  Both crew members saw a vehicle drive across the crossing from left to right, which was the direction that Mr. Johns came from, and turn right into the American Blanching parking lot.  *Id.*  The LDVR video shows that this vehicle drove across the crossing approximately ten seconds before the accident.  (LDVR 00:26).  The crew then focused on a vehicle that was pulling out of the American Blanching parking lot.  (McDonald dep., pp. 9-10, 17; Weeks dep., pp. 6, 16-17).  Both crew members testified that they were concerned the vehicle was

going to pull in front of the train.  *Id.*  The conductor told the engineer to watch out for the vehicle and the engineer blew a longer horn blast because of the vehicle.  *Id.*

The above evidence shows that the crew was maintaining a lookout as they approached the crossing, but that their attention was diverted to activity on the right side of the crossing.  Therefore, summary judgment should be granted on this claim.

Even assuming that there is a genuine issue of material fact regarding whether the crew maintained a proper lookout, the alleged failure to maintain a lookout was not a proximate cause of the accident.  A train crew is entitled to assume that a vehicle approaching a crossing will comply with its duty under Georgia law to stop and yield to a train that is in hazardous proximity to the crossing.  O.C.G.A. §40-6-140(a)(3) and (d); *Georgia Southern & F. R. Co. v. Haygood*, 103 Ga. App. 381, 384-85 (1961); *Petre v. Norfolk Southern Corp.*, 260 Fed. Appx. 756, 762 (6th Cir. 2007); *Bryan v. Norfolk & Western Ry. Co.*, 154 F.3d 899, 902 (8th Cir. 1998); *Lovett v. Union Pacific Railroad Co.*, 201 F.3d 1074, 1083-84 (8th Cir. 2000).  The train crew, therefore, it is not required to attempt to slow or stop the train until it is apparent that the vehicle is not going to stop before the crossing.  *Id.*

In this case, if the crew had seen Mr. Johns' vehicle before the accident, the crew would have been entitled to assume that Mr. Johns would stop and yield to the train.  Once it became clear that Mr. Johns was not going to yield, there was nothing that the train crew could have done to slow down the train or avoid the accident.  (Exhibit 1 to Peterson dep., p.7).

In *Lovett*, the plaintiff alleged that the train crew failed to maintain a lookout as evidenced by the crew's testimony that they did not see the vehicle before the accident. The court granted summary judgment in favor of the railroad because there was no evidence that the crew's failure to see the vehicle was a proximate cause of the accident. "The evidence demonstrated, and Lovett does not dispute, that regardless of whether the train's crew kept a lookout, the train could not have stopped in time or slowed enough to avoid the collision.  Thus, Union Pacific's failure to keep a lookout was not the proximate cause of Lovett's injuries."  201 F.3d at 1084.

Similarly, in *Petre* and *Bryan*, the courts held that summary judgment in favor of the railroad was proper because the plaintiff could not show that the alleged failure to maintain a lookout caused the accident.  *Petre*, 260 Fed. Appx. at 762; *Bryan*, 154 F.3d at 902.

Here, the alleged failure to maintain a lookout by the train crew did not play a role in this accident.  If the train crew would have seen Mr. Johns' vehicle before the accident, they would have been entitled to assume that Mr. Johns would stop and yield to the train. Once Mr. Johns drove onto the crossing, there was nothing that the train crew could have done to avoid this accident.  (Exhibit 1 to Peterson dep., p. 7).  Therefore, summary judgment should be granted on the Plaintiff's failure to yield claim.

**VI.   Marcus Johns had an unobstructed view of the train as it approached the AMC Crossing.**

Plaintiff alleges that Mr. Johns' view of the train was obstructed by vegetation in the southeast quadrant of the crossing.  (Doc. 1, ¶22).  On the date of the accident,

CSXT's Manager of Field Investigations Dillon Harrison took a series of photographs from the south side of the crossing on AMC Road to show the view that was available to Mr. Johns.  (Declaration of Dillon Harrison, ¶5).  The photographs clearly show that the vegetation in the southeast quadrant of the crossing would not have obstructed Mr. Johns' view of a westbound train.  (Exhibits 3, 4, 6, 7, 14 and 16 to Harrison Declaration).  Mr. Harrison, who is a former post-certified police officer, states in his declaration that a northbound driver on AMC Road on the date of the accident would have had a clear view of a train approaching AMC Road.  (Harrison Declaration, ¶6).

On January 6, 2015, photographer Warren Bond took nighttime photographs from the south side of the crossing with a train on the tracks to show the view that was available to Mr. Johns.  (Declaration of Warren Bond, ¶3).[8]  The photographs were taken with a train 150, 250, and 500 feet from the crossing and a vehicle 25, 50, and 100 feet from the crossing.  (Exhibits to Bond Declaration).  The vegetation in the southeast quadrant of the crossing on the date Bond's photographs were taken was similar to the vegetation present on the date of the accident.  (Harrison declaration, Bond dep., pp. 19-20).  Bond's photographs show that the train would have been clearly visible to Mr. Johns as he drove north towards the crossing on AMC Road and that any vegetation in the southeast quadrant would not have obstructed Mr. Johns' view of the train.  (Exhibits to Bond Declaration).

---

[8]The Declaration of Warren Bond has been filed with the Court in paper form because attached to the Declaration are high quality prints of his photographs.

Multiple witnesses who were familiar with the crossing at the time of the accident have also confirmed that the vegetation in the southeast quadrant of the crossing did not obstruct a motorist's view of a westbound train:

> Q: When you say long ways, what do you mean length wise?
> A: I mean obviously you can see - **I can see a mile or - at least a mile**.
> Q: From sitting inside of a car stopped at the stop sign?
> A: **Yeah, you can see a long way**.

(Harrison Deposition, p. 45 (emphasis added)).

> Q: ... What is your opinion, if any, regarding the view available of the track and approaching trains from Mr. Johns' perspective as he approaches the crossing headed north on Anderson Memorial Church Road?
> A: Yeah. **I do not remember seeing any obstructions**. ...

(Deposition of Bryan Robbins, p. 9 (emphasis added)).[9]

> Q: Now, other than those pine trees is there anything in this photograph that would have obstructed a driver's view?
> A: No, sir. I mean, you get on up here, say, all this - same thing on the north side. If you look to your left, I mean, you're going towards - **you look to the right, here, and you can see down that track four or five miles**.
> Q: Like if you were near the stop sign you think you could see -
> A: Oh, yeah. **If you were at the stop sign at the railroad sign and you look to your right, you could see that train because there's - you can see - you got an unobstructed view of three or four miles down there**.
> Q: Let me show you Defendant's No. 4, which is, appears to be a view a little bit closer to the tracks from south of the railroad track?
> A: Okay.
> Q: And, here, you can see that you've got a clear view down the tracks if you're looking to the right, is that correct?
> A: **When you get on up here on the right-of-way of the railroad you got a good view way out here.**

---

[7]Bryan Robbins is a CSXT police officer who formerly worked as a police officer for Ware County. He assisted Dillon Harrison with Harrison's investigation of the accident. (Robbins dep., pp. 5-7).

(Day dep., pp. 13-14 (emphasis added)).[10]

> Q: As the train got closer to the crossing, is there anything that would have obstructed your view of the locomotive and its lights that are on it?
> A: **Not that I could see at the time**.

(Marsh dep., p. 28 (emphasis added)).[11]

Finally, the video of the accident shows that there was no vegetation obstructing Mr. Johns' view as he neared the crossing. In the video, the crossbuck sign to the south of the crossing can be seen as the train approaches the crossing. (LDVR 00:33). The crossbuck sign was 17 feet from the near rail of the crossing. (Harrison dep., p. 15). There is no vegetation between the sign and the near rail. To the left (south) of the crossbuck sign, the video shows there is at least another 15-20 feet that has no vegetation obstructing the driver's view. (LDVR 00:33).

There is no evidence that vegetation in the southeast quadrant obstructed Mr. Johns' view of the train from AMC Road. All of the evidence, including photographs, witness testimony, and the video show that there were no obstructions to view and that Mr. Johns could have seen the train if he had used due care as he approached the crossing. Therefore, summary judgment should be granted on Plaintiff's claim that Mr. Johns' view of the train was obstructed. *See, e.g., DeMarco v. Ga. DOT*, 320 Ga. App. 324, 326-327 (2013) (affirming summary judgment based on photographs showing absence of condition alleged to have caused the accident); *Farmer v. Wheeler/Kolb Mgmt. Co.*, 224 Ga. App. 834, 835 (1997) (affirming summary judgment

---

[9]Day lived near the crossing and was at home at the time of the accident.

[8]Marsh is the Georgia State Trooper who investigated the accident.

based on "[o]bjective evidence in the form of a black and white photograph" that refuted the plaintiff's testimony); *Georgia Northern Railway Co. v. Dalton*, 133 Ga. App. 34, 37 (1974) ("In this situation [the] contrary testimony must yield to the photographs.").

**VII.    The Plaintiff's own negligence bars any recovery against CSXT.**

The evidence is conclusive that the CSXT train was burning its headlight and ditch lights, sounding its horn, and operating well below the maximum operating speed prior to the accident.  Put simply, there was no negligence on the part of CSXT that caused or contributed to the accident.  Instead, the negligence of Marcus Johns in failing to yield to the train was the sole cause, and certainly more than 50% responsible for the accident.

Under Georgia law, a plaintiff's negligence bars recovery if "the plaintiff is 50% or more responsible for the injury or damages claimed."  O.C.G.A. §51-12-33(g). Further, "[i]f the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover."  O.C.G.A. §51-11-7; *Holcomb v. Norfolk Southern Ry. Co.*, 295 Ga. App. 821 (2009) (granting summary judgment in favor of the railroad where pedestrian had clear view down the railroad tracks once she was within 8 feet of the tracks).  While questions of negligence and causation are typically jury questions, they can be resolved at the summary judgment stage in plain and indisputable cases.  *Holcomb*, 295 Ga. App. at 824.

A driver approaching a public at-grade crossing is required to yield to a train in hazardous proximity to the crossing.  At a crossing with a stop sign and crossbuck sign, the driver has a statutory duty to stop between 50 and 15 feet from the near rail of the

crossing.  O.C.G.A. §40-6-141.  After the driver stops, "he shall proceed only upon

exercising due care."  *Id.*  If the driver's view is obstructed, due care requires that the

driver pull forward to a location that allows for a better view down the tracks.  (Mortimer

dep., p. 39; Marsh dep., p. 12).  The driver should not pull onto the crossing until he has

confirmed that a train is not in hazardous proximity to the crossing.  *See* O.C.G.A. §40-6-

141.

> As the Supreme Court of Georgia explained over a century ago:
>
> A railroad-track is a place of danger; and one who goes thereon is bound
> to know that he is going into a place where he is subject to the dangers
> incident to the operation of trains upon that track.  This is true without
> regard to the place where the track is, whether in the country, where
> pedestrians are not expected to be, or at a public road crossing, or at a
> street crossing, or at the stations and depots of railroad companies, where
> persons are expected and invited to be present, no matter where the track is
> located, any person who goes upon the same is bound to know that he is
> going upon a place where his presence would be attended with more or
> less danger. ...  *An ordinarily prudent person in the possession of all his
> faculties would not attempt to cross a railroad-track at any place without
> using at least his sense of sight, if not that of hearing, to determine
> whether at the time and place he was about to cross the same there were
> present any of those dangers which a person of ordinary intelligence
> would reasonably apprehend.*

*Holcomb,* 295 Ga. App. at 824 (quoting *Western & Atlantic R. Co. v. Ferguson,* 113 Ga.

708, 713 (1901)).

Mr. Johns did not exercise ordinary care as he approached the AMC crossing

immediately before the accident.  The CSXT train was clearly visible and audible as it

approached the AMC Crossing.  The photographs, testimony, and video show that the

vegetation in the southeast quadrant would not have interfered with Mr. Johns' ability to

see the train.  The video confirms that 2 to 3 seconds before the accident, Mr. Johns had

an unobstructed view of the train, which would have been less than 200 feet from the crossing.  Therefore, there is no valid excuse for Mr. Johns' failure to see or hear the train and yield the right of way.  Accordingly, summary judgment should be granted on Plaintiff's claims based on the Plaintiff's own negligence.

### VIII.   Summary judgment is warranted on Plaintiff's punitive damages claim because Plaintiff has not adduced evidence that CSXT acted with the requisite culpable conduct.

Plaintiff's punitive damages claim fails as a matter of law because Plaintiff has failed to adduce evidence to satisfy Georgia's stringent punitive damages standard.  Under Georgia law, Plaintiff must prove "by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."  O.C.G.A. § 51-12-5.1(b).  In the context of punitive damages, "conscious indifference to consequences means an intentional disregard of the rights of another, knowingly or wilfully."  *Gregory v. Wal-Mart Stores E., L.P.*, No. CV 212-042, 2013 WL 3976648, at *2 (S.D. Ga. Aug. 2, 2013) (quoting *COMCAST Corp. v. Warren*, 286 Ga. App. 835, 839 (2007)).

> [I]t is well settled that "negligence, even gross negligence, is inadequate to support a punitive damages award. . . . Something more than the mere commission of a tort is always required for punitive damages.  There must be circumstances of aggravation or outrage."

*Lindsey v. Clinch County Glass, Inc.*, 312 Ga. App. 534, 535 (2011) (quoting *Brooks v. Gray*, 262 Ga. App. 232, 232-33 (2003)).

Here, there is simply no evidence that CSXT acted wilfully, maliciously, fraudulently, wantonly, or otherwise intentionally disregarded the rights of Plaintiff. Quite the opposite, the undisputed facts demonstrate that CSXT took numerous measures to warn Plaintiff of, and protect Plaintiff from, the approaching train:

- CSXT installed and maintained in good condition crossbucks at the AMC Crossing pursuant to O.C.G.A. §32-6-50(c)(2), which warned motorists of the crossing's presence (of which Mr. Johns was aware in any event).

- CSXT maintained its right of way so as to provide motorists with the ability to see approaching trains.

- The locomotive was equipped with a headlight and ditch lights in accordance with federal law.  See 49 C.F.R. § 229.125.  The headlight was burning on bright and the ditch lights were flashing as the train approached the AMC Crossing.

- The train was travelling 39 miles per hour as it approached the AMC crossing, which was 21 miles per hour below the maximum federally authorized speed for that area.

- The locomotive's bell was ringing as the train approached the AMC Crossing.

- The engineer began sounding the locomotive's horn approximately 23 to 24 seconds before the train entered the crossing and provided approximately 10.5 total seconds of horn in four blasts.

In other words, CSXT warned motorists of the crossings presence's, operated the train well below the authorized speed for the area, and provided motorists with multiple visual and audible warnings of the train's approach.  Any one of these measures taken alone would be sufficient to demonstrate that CSXT did not intentionally disregard Plaintiff's rights.  *See Macon-Bibb County Water & Sewerage Authority v. Tuttle/White Constructors, Inc.*, 530 F. Supp. 1048, 1057-58 (M.D. Ga. 1981) ("[A]nything that

-33-

negates a bad state of mind will usually preclude an award of punitive damages, as where the defendant is found to have acted in good faith[.]"); *see also Ballenger v. Mobil Oil Corp.*, 488 F.2d 707, 710 (5th Cir. Tex. 1974) ("[A] showing of any care whatever conclusively establishes . . . that there could not have been a conscious indifference to the rights and welfare of others[.]").  Combined, they conclusively establish that CSXT's conduct was the antithesis of that which is required to warrant the imposition of punitive damages.  Where, like here, "the record indicates that at trial, the plaintiff would not be able to establish by clear and convincing evidence culpable tortious conduct, authorizing the issuance of punitive damages, summary judgment [is] appropriate on such issue of damages."  *Taylor v. Powertel, Inc.*, 350 Ga. App. 356, 358 (2001).

## CONCLUSION

WHEREFORE, Defendant CSX Transportation, Inc. respectfully requests that the court grant summary judgment in CSXT's favor on all claims asserted by the Plaintiff Santana Johns.

This 12th day of October, 2015.

/s/ Jay C. Traynham
JAY C. TRAYNHAM
State Bar No.: 716231

/s/ J. Steven Stewart
J. STEVEN STEWART
State Bar No.: 681550

/s/ Walker S. Stewart
WALKER S. STEWART
State Bar No.: 221715

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2015, I electronically filed *Brief in Support of Defendant CSX Transportation, Inc.'s Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorney of record:

Craig Alan Webster
405 Love Avenue
Tifton, Georgia 31794


/s/ Jay C. Traynham
Jay C. Traynham
Ga. Bar Number: 716231
Attorney for Defendant

Hall, Bloch, Garland & Meyer, LLP
577 Mulberry Street, Suite 1500
Post Office Box 5088
Macon, GA 31208-5088
Telephone: (478) 745-1625
Email: jaytraynham@hbgm.com