**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | | |
|---|---|---|
| SANTANA JOHNS, individually and as the duly appointed Guardian of Robert Marcus Johns, an incapacitated adult, | : : : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE No.: 1:14-CV-125 (LJA) |
| CSX TRANSPORTATION, INC. | : : | |
| Defendant. | : : | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |

## ORDER

Before the Court are Plaintiff Santana Johns' Motion for Partial Summary Judgment, (Doc. 25), Defendant CSX Transportation, Inc.'s Motion for Summary Judgment, (Doc. 35), and Plaintiff's Motion to File a Surreply to Defendant's Reply in Support of its Motion for Summary Judgment, (Doc. 55).  For the reasons articulated below, Defendant's Motion for Summary Judgment, (Doc. 35), is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment, (Doc. 25) and Motion to File a Surreply to Defendant's Reply in Support of its Motion for Summary Judgment, (Doc. 55), are **DENIED**.

## FACTUAL BACKGROUND[1]

On August 12, 2013 at approximately 1:08 a.m., Robert Marcus Johns was driving his 1999 Dodge Dakota pickup truck north on Anderson Memorial Church Road ("AMC Road") in Fitzgerald, Georgia, towards a railroad crossing ("AMC Crossing" or "the Crossing"). (*See* LDVR[2] 1:08:56-09:02; Docs. 35-127 ¶ 16, 43-3 ¶ 16). As Mr. Johns approached the Crossing, Defendant's train was travelling west on its mainline track towards the Crossing. (*See* Doc. 35-64 at 19-23). At approximately 1:09 a.m., Defendant's train collided with Mr. Johns' truck at the Crossing. (*See* LDVR 1:08:56-09:02; Docs. 35-127 ¶ 1; 25-1¶ 1; 43-3 ¶¶ 1, 8 ). Mr. Johns sustained severe injuries to his head and body. (Doc. 1 ¶ 24). As a result, he is unable to speak, is bound to a wheelchair, and requires a feeding tube in his stomach. (Doc. 1 ¶ 24).

## I.   The AMC Crossing

At the AMC Crossing, AMC Road, a two-lane road, intersects Defendant's mainline railroad track. (*See* Doc. 35-14). The AMC Road generally runs in a north-south direction. (*See* Doc. 35-4 at 32, 6:2-14). Defendant's mainline track generally runs in an east-west direction. (Doc. 35-5 at 2:1-6). While the track is straight for several miles, it intersects AMC Road at approximately a 72 degree angle. (Doc. 43-3 ¶ 8). Pursuant to federal regulation, Defendant's mainline track at the Crossing is classified as a Class 4 track with a

---

[1] The relevant facts are derived from Plaintiff's Original Complaint, (Doc. 1), Plaintiff's Amended Complaint, (Doc. 17), Defendant's Answer to the Original Complaint, (Doc. 4), Defendant's Answer to the Amended Complaint, (Doc. 21), Plaintiff's Motion for Partial Summary Judgment, (Docs. 25, 25-2), Plaintiff's Statement of Material Facts in Support of her Motion for Partial Summary Judgment, (Doc. 25-1), Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, (Doc. 33), Defendant's Response to Plaintiff's Statement of Material Facts, (Doc. 34), Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, (Doc. 41), Defendant's Motion for Summary Judgment, (35, 35-1), Defendant's Statement of Undisputed Facts, (Doc. 35-127), Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, (Docs. 43, 43-1), Plaintiff's Response to Defendant's Statement of (Alleged) Undisputed Facts, (Doc. 43-3), and Defendant's Reply in Support of its Motion for Summary Judgment, (Doc. 52). Where relevant, this factual summary also contains undisputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to the non-moving party. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[2] Defendant filed conventionally with the Clerk's Office, Middle District of Georgia, Albany Division a DVD containing video footage of the accident as an attachment to the Declaration of Joshua Wildharber, a discovery analyst employed by Defendant ("LDVR"). *See* Doc. 36. The total length of the video is 3 minutes and 12 seconds and includes the first 36 seconds before the train collided with Mr. Johns' truck. The video is shot from the front of the lead locomotive and shows the date, changes in the locomotive's speed, horn activation, and bell activation over time.

maximum train speed limit of 60 miles per hour.   (Docs. 35-99; 35-127 ¶ 31; *see also* 49 C.F.R. § 213.9).  Table 100-E of an internal Timetable maintained by Defendant contains a Special Instruction ("TSI") for certain highway-rail grade crossings, requiring that "[c]rews [] approach crossings prepared to not foul the crossing until warning devices are functioning or flag protection is provided."  (Doc. 17-1 at 71).  According to the TSI, the maximum speed at which Defendant's trains could operate at the subject crossings is 15 miles per hour.  (Doc. 17 ¶ 10).  Prior to the accident, Defendant's trains travelled through the Crossing on a regular basis and as often as every fifteen to twenty minutes at night.  (*See* Docs. 35-4 at 9:4-17; 35-6 at 13:13-20).

The AMC Road is a county road in Ben Hill County, Georgia.  (Docs. 35-127 ¶ 2; 43-3 ¶ 2).  Towards the south, AMC Road dead-ends at an intersection with Seaboard Road.  (Docs. 35-4 at 8:8-14; 35-5 at 10:22-6).  A driver turning onto AMC Road from Seaboard Road and proceeding north towards the Crossing would pass a stop sign, stop bar,[3] and a railroad crossbuck sign before reaching the railroad track.   (*See* Docs. 35-127 ¶ 3).  The stop sign is located approximately 38 feet from the near rail[4] at the Crossing.  (Docs. 43-3 ¶ 4; 25-1 ¶ 2).  At the time of the accident, the crossbuck sign to the south of the Crossing was located approximately 17 feet from the near rail of the Crossing.  (Doc. 43-3 ¶ 5).  The stop bar is painted across the pavement of the north-bound lane and runs in line with the stop sign.  (*See* Doc. 35-108).

On the night of the accident, vegetation was present on Defendant's right of way near the stop sign.  (*See* Docs. 43-3 ¶ 7; 43-1 at 11; 35-36 at 9:6-15).  Photographs taken the morning after the accident and testimony from witnesses familiar with the Crossing indicate that a motorist's view from the stop sign looking east towards the mainline track was not obstructed by the vegetation.  (*See* Docs. 35-11).  Sean Alexander, one of Plaintiff's expert witnesses, calculated that the track was visible for approximately 300 feet from the stop sign.  (*See* Docs. 52-1 at 25:12-26:3; 52-2 at 1).  Other witnesses familiar with the Crossing indicate

---

[3] A stop bar is a white line painted across the pavement of a road, marking the point at which vehicles must stop at a traffic sign such as a stop sign.

[4] The near rail is the first rail encountered by north-bound motorists on AMC Road when they cross the railroad track.

that the railroad track was visible from the stop sign looking east for three or four miles.  (*See* Docs. 35-4 at 11:11-25, 34; 35-9 at 44:18-46:2; 35-127 ¶ 8).

Plaintiff alleges that, prior to Mr. Johns' accident, there were seven collisions between vehicles and trains at the AMC Crossing, dating back to 1983.  (Doc. 1 ¶ 7).  Phillip M. Allen, a State Traffic Safety and Design Engineer for the Georgia Department of Transpiration ("GDOT"), expressed concerns about safety at the AMC Crossing in a letter dated April 1, 2002 and addressed to the Larry Davis, Chairman of the Ben Hill County Board of Commissioners ("The Board").  (Doc. 35-34 at 11-13).  Mr. Allen noted that a study of the Crossing conducted by his office found that "the [C]rossing qualifies for train activated railroad warning devices consisting of flashing lights, bells and gates" but that the AMC Road was too narrow to accommodate the warning devices.  (*Id.* at 11).  Mr. Allen stated that the GDOT was willing to launch a project to install the warning devices but noted that "maintenance of the signs and pavement markings w[ould] be [The Board's] responsibility."  (*Id.*)  He also stated,

> [i]f you will agree to widen the road to a minimum of 20 feet for 150 feet before each approach of the crossing we can pursue our project. Of course this will also require working with the railroad for the widening of the crossing surface to accommodate the new widened roadway width. Once this is agreed to between you and the railroad, and the work is completed please let this office know.

(*Id.*)  The bottom of the letter indicated that it was copied to four other individuals associated with the GDOT and also listed the information for Mr. Doug Halpin at CSX Transportation as the railroad contact.  (*Id.*)  Mr. Halpin was not copied on the letter, and there is no evidence that Defendant or any of its representatives received or were aware of the GDOT letter.

## II.   The Accident

At the time of the accident, Mr. Johns had been employed at the American Blanching plant for approximately 11 months.  (Doc. 35-17 at 19:18-20:7).  The American Blanching plant building and parking lot are located in the northeast quadrant of the Crossing.  (See Docs. 35-4 at 32, 9:18-21; 35-5 at 11:7-9; 35-69 at 17:3-5).  Mr. Johns worked seven days

each week from 7:00 p.m. to 7:00 a.m.  (Doc. 35-17 at 20:11-14).  For at least 5 months prior to the accident, Mr. Johns' route to work from his house required him to drive his truck along Seaboard Road, turn left to travel north on AMC Road, traverse the AMC Crossing, and then turn right into the parking lot of the American Blanching Plant.  (*See* Docs. 35-127 ¶ 12; 35-17 at 19:18-20:7; 35-18 at 21:1-22, 27:3-29:18).  Prior to the accident, Mr. Johns and Plaintiff had discussed the importance of stopping his vehicle at the stop sign at the Crossing and exercising caution in driving across the railroad track.  (*See* Docs. 35-18 at 21:23-23:14; 35-127 ¶ 14).  Mr. Johns was returning to the American Blanching plant following his lunch break when the accident occurred.  (Doc. 35-127 ¶ 16).

On the night of the accident, Defendant's train was operated by engineer Michael McDonald.  (*See generally* Doc. 35-64).  Mr. McDonald was seated on the right side of the lead locomotive.  (*Id.* at 11:25-12:13).  The conductor, Ronnie Weeks, was seated on the left side of the locomotive.  (Doc. 35-69 at 6:20-25).  As the train entered the city of Fitzgerald, it was travelling at approximately 45 miles per hour.  (*See* LDVR at 1:08:35-09:00).  Mr. McDonald noted that the train would be approaching several crossings and started slowing the speed of the train.  (Doc. 35-64 at 9:21-25; 11:11-16).  Before the train reached the Crossing, the headlight on the lead locomotive was burning, the ditch lights were flashing, and Mr. McDonald sounded four horn blasts.  (*See* LDVR 1:08:35-09:02; Docs. 35-6 ¶ 26; 35-127 ¶ 17).

Defendant's train was equipped with an event data recorder ("EDR").  (*See* Doc. 35-59 at 20:17-24).  The EDR printout indicates that the first horn blast was initiated approximately 23 seconds before Defendant's train arrived at the AMC Crossing, sounded for approximately 2.4 seconds, and was followed by approximately 3.9 seconds of silence.  (*See* Docs. 35-59 at 21:17-22:4; 35- 62 at 2; 35-61 at 8; 25-2 at 8-9; 43-1 at 14; 35-1 at 17).  The second blast was initiated approximately 16 seconds before the Crossing, sounded for approximately 2.4 seconds, and was followed by approximately 5.1 seconds of silence.  (*See* Docs. 35-59 at 22:5-11; 35-61 at 8; 25-2 at 8; 43-1 at 14; 35-1 at 17).  The third blast was initiated approximately 7 seconds before the Crossing, sounded for approximately 3.1 seconds, and was followed by approximately 4 seconds of silence.  (*See* Docs. 35-59 at 22:12-

17; 35-61 at 8; 25-2 at 8; 43-1 at 14; 35-1 at 17).  The fourth blast was initiated approximately 2 seconds before the Crossing and sounded for approximately 3.6 seconds.  (*See* LDVR 1:08:56-09:03; Docs. 35-59 at 22:18-23:5, 35-61 at 8; 35-1 at 17).

As Defendant's locomotive approached the AMC Crossing, Mr. McDonald and Mr. Weeks were watching the tracks ahead when they noticed a vehicle to the right of the locomotive pulling out of the American Blanching plant's parking lot.  (*See* Docs. 35-64 at 9:21-10:5; 35-69 at 16:21-24).  That vehicle was being driven by James Barnes.  (*See* Doc. 35-6 at 15:12-29:25).  McDonald and Weeks then saw another vehicle cross the track from the left on AMC Road and continue towards the parking lot to the right of the locomotive. (Docs. 35-64 at 17:18-25; 35-69 at 17:21-22).  That vehicle was owned by "Ms. McCravy," an employee at the American Blanching plant.  (*See* Doc. 35-6 at 17:12-18).  Both men then observed Mr. Barnes' car on the right of the locomotive reverse and allow Ms. McCravy's car to turn into the parking lot.  (Docs. 35-69 at 17:21-25; 35-70 at 18:3-8).  Concerned that Mr. Barnes' car would drive into the train's path, both men kept watch on the right side of the locomotive.  (Doc. 35-69 at 16:21-17:12).  They saw Mr. Barnes' car begin to move towards the crossing again.  (Doc. 35-64 at 10:3-5).  McDonald then "blew [the horn] a little extra longer than [he] normally" would and Mr. Barnes stopped his car short of the Crossing.  (Doc. 35-64 at 10:6-7).

Video recorded from the front of the lead locomotive indicates that Mr. Johns' truck entered the Crossing approximately 6 seconds after Mr. McDonald sounded the third horn blast and less than two seconds after Mr. McDonald began to sound the fourth horn blast. (*See* LDVR 1:08:51-09:00; Docs. 35-59 at 22:18-23:5, 35-61 at 8; 35-1 at 17).   Neither crew member saw Mr. Johns' truck pull onto the track before the collision.  (Docs. 35-64 at 10:18; 35-70 at 18:20-24).  The train was travelling at approximately 39 miles per hour when it arrived at the Crossing.  (*See* LDVR 1:08:56-09:00; Doc. 43-3 ¶ 18).  Plaintiff alleges that Mr. Johns was travelling at approximately 5 miles per hour when his truck entered the Crossing. (Doc. 17 ¶ 5).  After the collision, Mr. McDonald applied the brakes and stopped the train. (*See* Docs. 35-64 at 11:17-24; 35-65 at 31:8-14).

In addition to the train crew and Mr. Johns, James Barnes is the only person who observed the events that led up to the accident. (Doc. 43-1 at 3). As a result of his injuries, Mr. Johns was unable to testify in this matter. (*Id.*) Mr. Barnes, who at the time of the accident was employed at the American Blanching plant, has provided testimony. (*See* Doc. 35-6 at 7:6-25). Barnes was familiar with the AMC Crossing, and described the weather conditions on the night of the accident as clear. (*Id.* at 23:21-25, 32:21-33:2, 36:23-25). According to Barnes, as Defendant's train approached the Crossing, he began exiting the plant's parking lot and turning south onto AMC Road. (*Id.* at 15:12-17). He indicated that he could clearly see the headlights and flashing ditch lights of the lead locomotive approaching "a good couple hundred feet" from the west. (*Id.* at 15:18-16:7; 24:1-3; 25:11-14). Mr. Barnes initially stopped his vehicle. (*Id.* at 15:12-7; 29:7-12). Believing he could beat the train across the tracks, Mr. Barnes started to accelerate but, after "see[ing] how fast it was coming[,]" decided to stop short of the Crossing. (*Id.* 29:7-25). Mr. Barnes does not recall hearing the horn blasts sounded by the train. (*Id.* at 26:24-27-19). As Defendant's train approached the Crossing, Mr. Barnes saw two vehicles traveling northbound on AMC Road. (*Id.* at 16:10-17:2). He recognized the first vehicle as belonging to Ms. McCravy and the second vehicle as Mr. Johns' truck. (*Id.* at 17:12-20). Mr. Barnes saw both vehicles stop, with Ms. McCravy's vehicle adjacent to the stop sign. (*Id.* at 18:8-16). After Ms. McCravy's vehicle proceeded across the track in front of the train, Mr. Barnes saw Mr. Johns' truck then "casually proceed[]" without stopping, in a "[k]ind of follow the leader [manner] behind [Ms. McCravy's] car." (*Id.* at 18:17-23).

## PROCEDURAL BACKGROUND

Plaintiff, Santana Johns, individually and as the duly appointed guardian of Robert Marcus Johns, an incapacitated adult, initiated this action by filing her Original Complaint on August 25, 2014. (Doc. 1). Therein, Plaintiff asserts negligence claims under Georgia common law and statutes arising from the accident involving her husband and a train owned and operated by Defendant, CSX Transportation, Inc. (*See generally id.*). Plaintiff seeks general damages, special damages for medical expenses, lost wages, and pain and suffering,

punitive damages, and court costs.  (*See id.* at 12-16).  On September 15, 2014, Defendant filed its Answer to Plaintiff's Original Complaint.  (Doc. 4).  On April 16, 2015, Plaintiff filed an Amended Complaint.  (Doc. 17).  On April 28, 2015, Defendant filed an Answer to Plaintiff's Amended Complaint.  (Doc. 21).  On September 3, 2015, Plaintiff filed a Motion for Partial Summary Judgment.  (Doc. 25).  On October 9, 2015, Defendant responded to Plaintiff's Motion for Partial Summary Judgment.  (Doc. 33).  On October 12, 2015, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims.  (Doc. 35).  On October 23, 2015, Plaintiff filed a Reply in support of her Motion for Partial Summary Judgment.  (Doc. 41).  On November 3, 2015, Plaintiff responded to Defendant's Motion for Summary Judgment.  (Doc. 43).  On December 7, 2015, Defendant filed a Reply in support of its Motion for Summary Judgment.  (Doc. 52).  The Parties' motions are now ripe for review.  *See* M.D. Ga. L.R. 7.3.1(a).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends no genuine issue of material fact remains and the party is entitled to judgment as a matter of law.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no genuine dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or show that there is some metaphysical doubt as to the material facts." *Matsuhita*, 475 U.S. at 586 (citations and internal quotations omitted). Instead, the nonmovant must point to evidence in the record that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form") (quotation omitted). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Local Rule 56 requires the movant to attach to its motion for summary judgment a separate and concise statement of material facts to which the movant contends there is no genuine issue to be tried. M.D. Ga. L.R. 56. The non-movant must then respond "to each of the movant's numbered material facts." *Id.* "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of

materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." *Id.*

In Plaintiff's Response to Defendant's Statement of (Alleged) Undisputed Facts she attempts to controvert several facts asserted by Defendant without any citation to the record. (*See generally* Doc. 43-3). Thus, Plaintiff has failed to comply with Local Rule 56 and those material facts in Defendant's Statement of Undisputed Facts, (Doc. 35-127), which are not controverted with citations to the record are "deemed to have been admitted, unless otherwise inappropriate. M.D. Ga. L.R. 56. The Court, however, "cannot grant a motion for summary judgment based on default or as a sanction for failure to properly respond." *United States v. Delbridge*, No. 1:06-CV-110-WLS, 2008 WL 1869867, at *3 (M.D. Ga. Feb. 22, 2008) (citing *Trustees of Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1040 (11th Cir. 2004)). Instead, the Court must undertake an independent review of "the evidentiary materials submitted in support of the motion" to ensure that the defendant has met its burden of demonstrating the absence of a genuine issue of material fact. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004); *see also Delbridge*, 2008 WL 1869867, at *3 (finding that the "Court must make an independent review of the record," even if the non-movant fails to respond to the statement of material facts.).

## DISCUSSION

Plaintiff asserts negligence claims against Defendant for failing to install active warning devices at the Crossing, failing to widen the Crossing, failing to identify and notify a governmental entity of the allegedly dangerous conditions and inadequate warnings at the Crossing, failing to install a crossbuck on the same post as the stop sign at the Crossing, failing to comply with its internal special instruction regarding train speed, failing to control excessive vegetation at the Crossing, failing to keep a proper lookout on its locomotive, and failing to comply with the federal horn regulation. (*See* Docs. 1, 17, 43-1). Plaintiff moves for partial summary judgment on two claims: Defendant's failure to notify a governmental entity of the alleged dangerous conditions and inadequate warnings at Crossing, and

Defendant's violation of the federal horn regulation.  (*See* Docs. 25-2, 41).  Defendant seeks summary judgment on all of Plaintiff's negligence claims and its affirmative defense that Johns' contributory negligence bars recovery.  (*See* Docs. 35-1, 52, 33).

## I.   Plaintiff's Claims against Defendant for Breaching its Common Law Duty of Ordinary Care and Duty to Maintain the AMC Crossing Under O.C.G.A. § 32-6-190

Both Parties move for summary judgment on the issue of whether Defendant negligently breached its duty of ordinary care and its duty under Georgia law to properly maintain the grade at the AMC Crossing by failing to install active warning devices at the Crossing and to widen the crossing surface at the AMC Crossing.  (Docs. 1 ¶¶ 11, 16-20; 17 ¶ 21).  Plaintiff's claims fail as a matter of law because neither Defendant's common law duty of ordinary care nor its duty to maintain the Crossing under Georgia law requires that Defendant install active warning devices at the Crossing or widen the Crossing.

### A.   Duty to Install Active Warning Devices

Georgia Code of Public Transportation ("GCPT"), O.C.G.A. § 32-1-1, *et seq.* imposes upon railroad companies a general duty to maintain grade crossings:

> Any railroad whose track or tracks cross a public road at grade shall have a duty to maintain such grade crossings in such condition as to permit safe and reasonable passage of public traffic.

O.C.G.A. § 32-6-190.  The GCPT defines "maintenance" as "the preservation of a public road, including repairs and resurfacing *not amounting to construction* as defined in this Code section."  *Id.* § 32-1-3-(15) (emphasis added); *Evans Timber Co., Inc. v Cent. Of Ga. R.R. Co.*, 239 Ga. App. 262, 265-66, 519 S.E.2d 706 (1999) (overruled on other grounds by *Fortner v. Town of Register,* 278 Ga. 625, 626, 604 S.E.2d 175 (2004)).[5]  "Under the [GCPT],

---

[5] In *Evans Timber*, the Court of Appeals of Georgia held that the GCPT precludes a common law cause of action against a railroad for failing to initiate and authorize the installation of protective devices at grade crossings on public roads. 239 Ga. App. 262, 266, 519 S.E.2d 706. The court noted that the following footnote of the Supreme Court of Georgia's decision in *Kitchen v. CSX Transp. Inc.* provided "insightful guidance": "O.C.G.A. §§ 32-6-50 and 32-6-51(a) . . . place the exclusive duty in the governmental body to install and maintain traffic control devices on public roads (including railroad crossings), and . . . statutorily prohibit private entities, including railroads, from placing traffic control devices on the public roads." 239 Ga. App. 262, 263, 519 S.E.2d 706 (quoting 265 Ga. 206, 208, n.6, 453 S.E.2d 712 (1995)).

maintenance does not include installation of protective devices on a public road crossing." *Evans Timber*, 239 Ga. App. at 266, 519 S.E.2d 706. Instead, the GCPT delegates exclusive authority to order the installation of protective devices at the Crossing to the governmental authority responsible for the public road:

> Whenever, in the judgment of the department[6] in respect to the state highway system, a county in respect to its county road system, or a municipality in respect to its municipal street system, such protection is reasonably necessary for the safety of the traveling public, the department or the county or the municipality may order the protection of a grade crossing by the installation of protective devices.

O.C.G.A. § 32-6-200(a). Thus Defendant's statutory duty to maintain the Crossing does not include a duty to install active warning devices.

Further, it is well established that a railroad's common law duty of ordinary care does not include a duty to install active warning devices. As the *Evans Timber* court stated, "[t]he GCPT precludes a common-law cause of action against a railroad for the failure to install adequate protective devices at a grade crossing on a public road where the railroad has not been requested to do so by the appropriate governmental entity." 239 Ga. App. at 266, 519 S.E.2d 706. *See also CSX Transp., Inc. v. Trism Specialized Carriers, Inc.*, 182 F.3d 788, 792 (11th Cir. 1999) (holding that the GCPT "overrule[s] the state common law cause of action against railroads for negligent failure to install adequate warning devices at public crossings."); *Brantley v. CSX Transp., Inc.* 437 F. Supp.2d 1327, 1332 (N.D. Ga. 2006) (holding that "the

---

Subsequently in *Fortner*, the Supreme Court of Georgia ruled that footnote 6 in *Kitchen* was dicta, overruled *Evans Timber* only "[t]o the extent that [its] holding . . . is based on . . . dicta [from the *Kitchen* footnote,]" and held that the GCPT does not preclude a common law cause of action against a private party for the placement or maintenance of any structure that obstructs a clear view from a railroad from a public road. 278 Ga. 625, 626-628, 604 S.E.2d 175. Accordingly, *Evans Timber* is still good law on the issue of whether Defendant had a common law duty to install active warning devices at the AMC Crossing. *See Long v. CSX Transp., Inc.*, 635 F App'x 724, 727 ("[T]he Georgia Supreme Court in *Fortner* never says it overruled the ultimate conclusion about protective devices in *Evans Timber* (that the GCPT preempted the railroad's common law duty to install protective devices). Thus, *Evans Timber* [] remain[s] good law to us[;]" *Bentley v. CSX Transp., Inc.*, 437 F. Supp.2d 1327, 1331 ("*Fortner* did not overrule the underlying holding in *Evans Timber* that the common law duty of railroads to initiate and authorize the installation of protective devices at grade crossings on public roads has been preempted by [the GCPT].").

[6] Pursuant to O.C.G.A. § 32-1-3(9), "'Department' means the Department of Transportation." Pursuant to O.C.G.A. § 32-1-3(7), "County" means either one of the several counties, any division, department, agency, authority, instrumentality, or branch thereof, or the county governing authority, that is, the judge of the probate court, board of county commissioners, county commissioner, or other county officers in charge of the roads, bridges, and revenues of the county." Thus, for the purposes of this Order, "county" or "Ben Hill County" refers to the Board of Commissioners of Ben Hill County.

GCPT precludes a claim against a railroad for failure to install protective devices at grade crossings on public roads.").

Moreover, there is no record evidence that Defendant received any request from the GDOT to install warning devices at the Crossing.  Plaintiff alleges that in or about April, 2002, the GDOT advised Defendant and The Board that the Crossing needed active warning devices and that it was their responsibility to widen the crossing surface. (*See* Doc. 1 ¶ 12-15, 17-20).  However, Plaintiff points to no evidence in the record to support her allegation that, prior to Mr. Johns' accident, Defendant received any request from the GDOT to install warning devices at the Crossing.  (*See* Doc. 43-3 ¶¶ 9, 10).  The letter referenced by Plaintiff was from the GDOT to the Chairman of The Board.  At no point does the GDOT or The Board, which is the department referenced in O.C.G.A. § 32-6-200(a), order that protective devices be installed at the AMC Crossing.

## B.  Duty to Widen the AMC Crossing

Plaintiff alleges that Defendant breached its duty of maintenance under O.C.G.A. § 32-6-190 and its duty of ordinary care by failing to widen the road and crossing surface at the AMC Crossing.  (Doc. 1 ¶¶ 13-15, 18-20).

The GCPT broadly imposes upon a county the duty to "plan, designate, improve, manage, control, construct, and maintain an adequate county road system and [] have control of and responsibility for all construction, maintenance, or other work related to the county road system."  O.C.G.A. § 32-4-41(1).  As discussed above, § 32-6-190 imposes a narrower duty on railroad companies to maintain grade crossings.  The GCPT defines "maintenance" as "the preservation of a public road, including repairs and resurfacing not amounting to construction as defined in this Code section."  *Id.* § 32-1-3-(15); *Evans Timber Co.*, 239 Ga. App. at 265-66, 519 S.E.2d 706.  The GCPT also defines "construction" as:

> [T]he planning, location, surveying, designing, supervising, inspecting, and actual building of a new road; or the paving, striping, restriping, *modifying for safety purposes*, grading, *widening*, relocation, reconstruction, or other major improvement of a substantial portion of an existing public road together with all activities incident to any of the foregoing.

O.C.G.A. § 32-1-3(6) (emphasis added).  Therefore, as a matter of law, Defendant's duty of maintenance under § 32-6-190 excludes any obligation to "widen[]" and thus "modify[] for safety purposes" the AMC Crossing.  *See* O.C.G.A.  §§ 32-1-3-(15), 32-1-3(6); *Evans Timber*, 239 Ga. App. at 265-66, 519 S.E.2d 706.

Furthermore, "the GCPT precludes a common law cause of action against CSX for the failure to modify a railroad grade crossing on a public road where the railroad has not been requested to do so by the GDOT." *Long v. CSX Transportation, Inc.*, No. 1:13-CV-990-ODE, 2015 WL 11023211, at *9 (N.D. Ga. April 10, 2015).  As discussed above in Section I(A), neither the GDOT nor The Board requested that Defendant widen the crossing surface to accommodate the installation of the warning system.

### C. Duty to Identify and Notify a Governmental Entity of Allegedly Dangerous Conditions and Inadequate Warnings at the AMC Crossing

Plaintiff claims that Defendant also breached its duty to maintain a safe crossing under O.C.G.A. § 32-6-190 by failing to identify and bring to the attention of the GDOT or The Board the dangers and inadequate warning signs at the Crossing.  (Doc. 43-1 at 3-7).  Plaintiff's claim fails as a matter of law.  Plaintiff alleges that the dangerousness of the AMC crossing was evidenced by reports of seven (7) accidents at the Crossing prior to Mr. Johns' accident.  (*Id.* at 7).  As legal support for her claim, Plaintiff cites footnote 5 in Supreme Court's decision in *CSX v. Easterwood.*  Therein, the Court stated:

> [W]e note that Georgia Code Ann. § 32-6-190 (1991) provides that railroads are under a duty to maintain their grade crossings "in such condition as to permit the safe and convenient passage of public traffic." While final authority for the installation of particular safety devices at grade crossings has long rested with state and local governments . . . this allocation of authority apparently does not relieve railroads of their duty to take all reasonable precautions to maintain grade crossing safety, *Southern R. Co. v. Georgia Kraft Co.*, 188 Ga. App. 623, 624, 373 S.E.2d 774, 776 (1988), including, for example identifying and bringing to the attention of the relevant authorities dangers posed by particular crossings.

507 U.S. 658, 665 n.5 (1993).  However, footnote 5 in *Easterwood* is no longer good law. *Georgia Craft Co.*, the case on which footnote 5 is based, was subsequently overruled by the Georgia Court of Appeals in *Evans Timber*.  *See* 239 Ga. App. at 266, 519 S.E.2d 706 ("We expressly overrule *Southern R. Co. v. Ga. Kraft Co.* [] which did not consider the effect of the

GCPT. . . .").  In so doing, the *Evans Timber* court ruled that § 32-6-190 only "places a duty on a railroad to maintain grade crossings and protective devices *after installation.*"  *Id.*  Accordingly, Plaintiff's claim that O.C.G.A. § 32-6-190 imposes a duty on Defendant to identify and bring to the attention of the GDOT or The Board the alleged dangers and inadequate warning signs at the Crossing fails as a matter of law.

Plaintiff also moves for leave to file a surreply brief to Defendant's Reply in support of its motion for summary judgment ("Motion for Surreply").  (Doc. 55).  In its Reply brief, Defendant argues that Plaintiff's claim that it failed to identify and notify a governmental entity of the allegedly dangerous conditions and inadequate warnings at the AMC Crossing was not pled in her Complaint and thus should be dismissed as untimely.  (*See* Doc. 52 at 2).  In her Motion for Surreply, Plaintiff seeks to brief the Court on why this claim is not new and thus should not be dismissed.  However, in granting summary judgment in favor of Defendant on this claim, the Court does not dismiss it on the basis that it was untimely filed.  Thus, there is no need for a surreply to address timeliness and Plaintiff's Motion for Surreply, (Doc. 55), is **DENIED**.

## II.  Plaintiff's Claim against Defendant for Negligently failing to install a Crossbuck on the Same Post as the Stop Sign at the AMC Crossing

Plaintiff alleges that Defendant negligently failed to install the crossbuck on the same post as the stop sign at the AMC Crossing.  (Doc. 17 ¶ 21).  Defendant moved for summary judgment on this claim on the bases that Defendant was not responsible for the location of the stop sign and that interfering with a stop sign violates Georgia law.  (Doc. 35-1 at 21-22).  Plaintiff has not addressed Defendant's argument on summary judgment regarding this claim.  When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims. *See Jolley v. Triad Mechanical Contractors*, 2015 WL 1299852, at *8, n. 16 (M.D. Ga. 2015); *Sentinel Ins. Co., Ltd. v. Action Stop, LLC*, 958 F.Supp.2d 1368, 1381 (M.D. Ga. 2013); *Hammond v. Gordon County*, 316 F. Supp. 2d 1262, 1280 (N.D. Ga. 2002).

Therefore, Plaintiff has abandoned her claim that Defendant negligently failed to install a crossbuck on the same post displaying the stop sign at the Crossing.

Further, Plaintiff's claim fails as a matter of law. While the GCPT imposes upon railroad companies a duty to install crossbucks at every public crossing, the statute also delegates responsibility for the placement and maintenance of all other signs on public roads, including stop signs, to the governmental entity with jurisdiction over the road. O.C.G.A. § 32-6-50(c)(2). It is also unlawful for Defendant to tamper with the stop sign. *See* O.C.G.A. § 32-6-50(d) ("It shall be unlawful for any person to remove, deface, or damage in any way any official traffic-control device lawfully erected or maintained pursuant to this Code Section or any other law."). Therefore, Defendant had no authority or duty to place the crossbuck on the same post as the stop sign at the AMC Crossing. Accordingly, this negligence claim fails as a matter of law.

### III.   Plaintiff's Claim against Defendant for Failing to Comply with Internal Special Instruction Regarding Train Speed

Plaintiff alleges that, upon approaching the Crossing on the night of the accident, Defendant negligently operated its train at a speed that failed to comply with its own internal rule limiting the speed of such trains to no more than 15 miles per hour. (*See* Doc. 17 ¶ 10, 21; 43-1 at 8-10). According to Defendant's TSI, the maximum speed at which Defendant's trains could operate at the subject crossings was 15 miles per hour. Regardless of Defendant's internal rule, the Federal Road Safety Act of 1970 ("FRSA") preempts common law claims against railroad companies for operating at excessive speeds unless the internal rule allegedly violated by a railroad company was created pursuant to a federal regulation or order issued by Secretary of Transportation ("SOT") or the Secretary of Homeland Security ("SHS"). *See* 49 C.F.R. § 213.9; *Easterwood*, 507 U.S. 658, 673-74 (finding that respondent's claim that "petitioner breached its common-law duty to operate train at moderate and safe rate of speed" was preempted by 49 C.F.R. § 213.9); *Michael v. Norfolk Southern Railway Co.*, 74 F.3d 271, 273-74 (11th Cir. 1996) (finding "[a]ny state law claim based on the train's excessive speed is preempted by federal law, specifically the train speed

regulations set out in 49 C.F.F. § 213.9."); 49 U.S.C. § 20106(b)(1)(B) ("[n]othing in this section shall be construed to preempt an action under state law seeking damages for personal injury, death, or property damage alleging that a third party has failed to comply with its own plan, rule or standard that it created pursuant to a regulation or order issued by either of the Secretaries.").

Here, it is undisputed that, under 49 C.F.R. § 213.9, Defendant's track at the AMC Crossing is classified as a Class 4 track and that the maximum allowable speed along the track is 60 miles per hour.  It is also undisputed that, on the night of the Mr. Johns' accident, Defendant's train was travelling at approximately 39 miles per hour upon arriving at the AMC Crossing.  Thus the speed of Defendant's train at the time of the accident complied with 49 C.F.R. § 213.9.

Plaintiff appears to argue that because 49 C.F.R. § 217.7 requires that a railroad company file with the Federal Railroad Administration ("FRA") "one copy of its code of operating rules, timetables, and timetable special instructions" that the TSI was developed pursuant to a regulation or order issued by the SOT or SHS.  The requirement that Defendant must file the TSI, however, does not establish that the TSI was created pursuant a regulation or order.  *See Murrell v. Union Pacific Railroad Co.*, 544 F. Supp.2d 1138, 1144-51 (D. Or. 2008) (finding that "Union Pacific's maximum timetable speed limits were internal rules that were not 'created pursuant to a [federal regulation] or order issued by either of the Secretaries'" (citing 49 U.S.C. § 20106)).  Plaintiff does not point to any federal regulation or order that required Defendant to create the TSI on which it relies.  *See National R.R. Passenger Corp. v. Young's Commercial Transfer, Inc.*, No. 1:13-CV-1506-DAD, 2016 WL 3538226, at *10 (E.D. Cal. Jun. 28, 2016), ("[E]ven if it could be credibly claimed that the very general Amtrak operating rules cited by plaintiff were violated, plaintiff has failed to point to any federal regulations mandating the adoption of those operating policies.").  Nor does Plaintiff point to any federal regulation or order setting the timetable speed at 15 miles per hour for the AMC Crossing.  Accordingly, Plaintiff's common law claim that Defendant negligently failed to comply with the speed limitation prescribed in its internal rule is preempted by federal law and fails as a matter of law.

IV.     **Proximate Cause and Contributory Negligence**

"In order to state a cause of action for negligence it is necessary to establish the essential elements of duty, breach of that duty, and proximate cause[.]" *Black v. Georgia Southern & Florida Ry. Co.*, 202 Ga. App. 805, 806, 415 S.E.2d 705 (1992). *See also Atlanta Obstetrics v. Coleman*, 260 Ga. 569, 569, 398 S.E.2d 16, 17 (1990) ("To recover damages in a tort action, a plaintiff must prove that the defendant's action was both the 'cause in fact' and the 'proximate cause' of her injury."). "While the question of proximate cause is usually submitted to the jury as a question of fact, it may be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's acts were not the proximate cause of the injury." *Atlanta Gas Light Co. v. Gresham*, 260 Ga. 391, 393, 394 S.E.2d 345 (1990) (internal citation omitted).

"It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury." *Black*, 202 Ga. App. at 808, 415 S.E.2d 705. "A defendant who pierces the plaintiff's pleadings by showing that under any theory one essential element is lacking is entitled to summary judgment despite any remaining issues of fact with respect to other essential elements." (*Id.*)

A. **Duty to Maintain Crossing by Controlling Excessive Vegetation**

Plaintiff claims that Defendant breached its statutory and common law duty to maintain the Crossing by allowing excessive vegetation to grow on its right of way. (Docs. 1 ¶ 22; 43-1 at 11-15). Specifically, Plaintiff alleges that Defendant "allowed vegetation to grow up around the subject crossing and, in particular, around the stop sign as it existed at the time of the subject collision, which said vegetation significantly impaired motorists' ability to see a train approaching from the east if the motorist is stopped at the stop sign. . . ." (Doc. 1 ¶ 22). Defendant moves for summary judgment on the bases that the record evidence demonstrates that the vegetation did not obstruct Mr. Johns' view of a

westbound train at the stop sign and Mr. Johns violated his duty under Georgia law to proceed with ordinary care through the Crossing.  (*See* Doc. 35-1 at 26-30; 52 at 12-14).

Plaintiff's statutory claim fails as a matter of law.  O.C.G.A. § 32-6-51 provides,

It shall be unlawful for any person to erect, place, or maintain in a place or position visible from any public road any unauthorized sign, signal, device, or other structure which[,] [b]ecause of its nature, construction, or operation, constitutes a dangerous distraction to or interferes with the vision of drivers of motor vehicles.

O.C.G.A. 32-6-51(b)(4).  Georgia courts have interpreted § 32-6-51(b) to "prohibit[] the placement or maintenance of certain structures . . . . includ[ing] trees and other vegetation." *Fortner*, 278 Ga. at 627, 604 S.E.2d 175 (internal citation omitted).  This statute, however, applies only "[w]here vegetation is purposely planted, whether for landscaping or some other function, it may constitute a 'structure' as used in statutory language."  *Id.* (internal citation omitted).  Thus, the statute applies to vegetation planted, for example, as part of a municipal park, (*see id.* at 627), or for cosmetic reasons, (*see Howaard v. Gourmet Concepts Intern., Inc.*, 242 Ga. App. 521, 529 S.E.2d 406 (2000).  Here, there is no evidence that the allegedly obstructive vegetation was purposely planted for any reason.  As such, O.C.G.A. § 32-6-51(b) was not violated, and Plaintiff's statutory claim thus fails as a matter of law.

In order to survive summary judgment on her common law claim that Defendant breached its duty to control the vegetation, Plaintiff must establish that Defendant had a common law duty, breached that duty, and that the breach was the proximate cause of Mr. Johns' injuries.  *See Black*, 202 Ga. App. at 806, 415 S.E.2d 705.  Under Georgia law, railroads have a common law duty to control vegetation on their right-of-ways at public crossings.  *See Fortner*, 278 Ga. at 627, 604 S.E.2d 175 (holding that O.C.G.A. § 32-6-51(b) does not preempt the common law, and thus "[t]o the extent that the common law imposed the duty to prevent vegetation from obstructing vision at a railroad crossing, that duty remains in effect.") (internal citations omitted)).  Plaintiff points to a photograph that appears to be taken from a vehicle in the northbound lane of AMC Road located several feet from the stop sign and the vegetation.  (*See* 43-1 at 11).  Plaintiff also argues that the video recording from the lead locomotive demonstrates that the vegetation created an obstruction because it shows the headlights of the car ahead of Mr. Johns approach the crossing on

AMC Road, then get "completely block[ed]" before that car is visible crossing the rails. (*See* Doc. 43-1 at 12). However, this evidence is not probative of whether the vegetation obstructed Mr. Johns' view of the Defendant's train from the stop sign on AMC Road on the night of the accident. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.")

In contrast, there is significantly probative evidence that the vegetation did not obstruct a clear view of stop sign and tracks. Mr. Barnes, the sole eye witness to testify, observed that the weather conditions at the Crossing just before the accident were clear. Plaintiff's expert witness, Sean Alexander, calculated that the tracks towards the east of the stop sign would have been visible for approximately 300 feet on the night of the accident. Photographs taken the morning after the accident from the stop sign looking east clearly show no obstruction in the view of the tracks. Mr. Barnes and several other witnesses familiar with the AMC Crossing on the night of the accident opined that a motorist's view of a westbound train from the stop sign Mr. Johns encountered was unobstructed by the vegetation. Mr. Barnes, also observed Mr. Johns stop his vehicle behind another at the stop sign then "casually proceed[]" onto the Crossing.

Even if the evidence established that Defendant breached a duty by failing to maintain the vegetation in its right of way, the plain, palpable and undisputed evidence is that Mr. Johns' failure to stop at the stop sign and then proceed only after exercising due care constitute, the sole proximate cause of the accident. O.C.G.A. § 40-6-141 requires that drivers approaching a railroad crossing with a stop sign stop their vehicle "within 50 feet but not less than 15 feet from the nearest rail" and "proceed only upon exercising due care." O.C.G.A. § 40-6-141. Even if a stop sign is not present, O.C.G.A. § 40-6-140 requires that such drivers stop "within 50 feet but not less than 15 feet from the nearest rail" and "not proceed until [they] can do so safely when . . . [a]n approaching train is plainly visible and is in hazardous proximity to such crossing." O.C.G.A. § 40-6-140(a)(3). "[B]efore it can be said in a given case that an approaching train was 'plainly visible' as a matter of law, it must

appear as a matter of law that a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety should have seen it." *Seaboard Coast Line R. Co. v. Mitcham*, 127 Ga. App. 102, 104, 192 S.E.2d 549 (1972) (citations omitted).

The record evidence shows that a driver travelling north on AMC Road towards the Crossing, like Mr. Johns on the night of the accident, must pass a stop sign located approximately 38 feet from the near rail and adjacent to a stop bar painted across the road, and a crossbuck located approximately 17 feet from the near rail.  Prior to the accident, Mr. Johns was familiar with the crossing as he drove to and from his workplace at the American Blanching plant several times each day over 5 months.  Mr. Johns and Plaintiff had also talked about the need to exercise caution and stop for trains when he drove through the Crossing.  Despite the fact that Mr. Johns was familiar with the sign and the Crossing and despite the fact that the Ms. McCravy's vehicle, which was directly in front of Mr. Johns' truck, stopped at the stop sign before crossing the tracks, the evidence shows that Mr. Johns failed to stop at the stop sign when he approached it.  Instead, after stopping behind Ms. McCravy's vehicle, the evidence shows that Mr. Johns proceeded onto the Crossing without coming to a stop.  Furthermore, the evidence shows that, as Defendant's train approached the AMC Crossing, the headlight on the lead locomotive was burning, the ditch lights were flashing, and at least four horn blasts sounded from the lead locomotive.  Accordingly, the record evidence clearly and palpably reveals that the alleged excessive vegetation did not obstruct the view from the stop sign of a plainly visible train travelling from east to west on the tracks and thus was not the proximate cause of Mr. Johns' injuries.

### B. Failure to Keep a Proper Lookout

Plaintiff claims that Defendant "negligently operated its train without keeping a proper lookout as required by ordinary prudence and the applicable Code of Operating Rules established by the Defendant[.]"  (Doc. 17 ¶ 21).  Upon review, Plaintiff has failed to support this claim with "any argument based on relevant legal authority" in her summary judgment pleadings. *Brackin v. Anson,* 585 F. App'x 991, 994 (11th Cir. 2014) (internal citation omitted).  As previously noted, when a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other

arguments, the non-moving party abandons these claims. *See Jolley*, 2015 WL 1299852, at *8, n. 16; *Sentinel Ins. Co., Ltd.*, 958 F.Supp.2d at 1381; *Hammond*, 316 F. Supp. 2d at 1280 (N.D. Ga. 2002). Accordingly, Plaintiff has abandoned her claim that Defendant negligently failed to keep a proper lookout on the train involved in Mr. Johns' accident.

Further, the record evidence shows no genuine issue of material fact as to whether the train crew exercised ordinary care in operating the lead locomotive. Although neither crew member saw Mr. Johns' truck enter the Crossing from the left side of the locomotive, the record evidence demonstrates that the train crew was looking ahead as they approached Fitzgerald and observed the following as they neared the Crossing: 1) Mr. Barnes' vehicle begin to exit the American Blanching plant on the right side of the locomotive; 2) Ms. McCravy's vehicle cross the tracks from the left of the side of the locomotive; 3) Mr. Barnes back up to allow Ms. McCravy's vehicle to enter the parking lot on the left side of the locomotive; and 4) Mr. Barnes begin to accelerate towards the Crossing again then stop after Mr. McDonald sounded a long third horn blast as a warning. Accordingly, the evidence establishes that Defendant's train crew was actively exercising ordinary care in observing the Crossing, warning and monitoring the foreseeable threat posed by Mr. Barnes immediately before the collision.

Moreover, the evidence demonstrates that the alleged failure to maintain a proper lookout was not the proximate cause of the Mr. Johns' injuries. Video from the front of the lead locomotive shows that Mr. Johns pulled onto the crossing less than 2 seconds before Defendant's train, which was travelling at approximately 39 miles per hour when it arrived. Under O.C.G.A. § 40-6-140(d), Mr. Johns had a statutory duty to not "drive a vehicle over a railroad grade crossing when a train is approaching." Further, under Georgia law, "there is no duty requiring an engineer to stop his train merely upon the approach of a vehicle to the crossing where there are no facts shown which would authorize him to assume that the driver of the car would not, in the exercise of ordinary care for his own safety, bring his vehicle to a halt before reaching said crossing." *Georgia Southern & F.R. Co. v. Haygood*, 103 Ga. App. 381, 385, 119 S.E.2d 277 (1961). Thus, even if the train crew did see Mr. Johns' truck before it entered the Crossing, the engineer had no duty under Georgia law, and

Plaintiff has not established that he had the practical ability, to stop the train moving approximately 39 miles per hour before Mr. Johns entered the Crossing.  Furthermore, there is no record evidence that establishes that the engineer should have assumed that Mr. Johns would not have exercised ordinary care for his own safety by stopping before reaching the tracks.  Accordingly, a reasonable trier of fact could only conclude that the alleged failure to maintain a proper lookout was not the proximate cause of the Mr. Johns' injuries.  *See Gresham*, 260 Ga. at 393, 394 S.E.2d 345 ("While the question of proximate cause is usually submitted to the jury as a question of fact, it may be decided as a matter of law where the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's acts were not the proximate cause of the injury.").

### C.  Non-Compliance with the Federal Horn Regulation

Both Parties move for summary judgment on the issue of whether Defendant's non-compliance with the federal horn regulation was the proximate cause of the Accident.  The federal horn regulation, codified at 49 C.F.R. § 222.21, provides:

> (a) [T]he locomotive horn on the lead locomotive of a train ... shall be sounded when such locomotive ... is approaching a public highway-rail grade crossing. Sounding of the locomotive horn with two long blasts, one short blast and one long blast shall be initiated at a location so as to be in accordance with paragraph (b) of this section and shall be repeated or prolonged until the locomotive occupies the crossing. This pattern may be varied as necessary where crossings are spaced closely together.
>
>                 \*\*\*
>
> (b)(2) Except as provided in paragraphs (b)(3) and (d) of this section ..., the locomotive horn shall begin to be sounded at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing. It shall not constitute a violation of this section if, acting in good faith, a locomotive engineer begins sounding the locomotive horn not more than 25 seconds before the locomotive enters the crossing, if the locomotive engineer is unable to precisely estimate the time of arrival of the train at the crossing for whatever reason.

Thus, the regulation requires four horn blasts to be sounded in a pattern of a long, long, short, then long blast that starts no more than 25 seconds before a train enters a public crossing.  However, the regulation does not prescribe a specific duration or time range for a blast to qualify as "long" or "short."  Nor does it prescribe the permissible duration of silence between horn blasts.

The EDR indicates that the first horn blast was initiated approximately 23 seconds before Defendant's train arrived at the AMC Crossing, sounded for approximately 2.4 seconds, and followed by approximately 3.9 seconds of silence.  The second blast was initiated approximately 16 seconds before the crossing, sounded for approximately 2.4 seconds, and followed by approximately 5.1 seconds of silence.  The third blast was initiated approximately 7 seconds before the Crossing, sounded for approximately 3.1 seconds, and followed by approximately 4 seconds of silence.  The fourth blast was initiated approximately 2 seconds before the Crossing and sounded for approximately 3.6 seconds. Thus, the record evidence shows that, upon its approach to the Crossing on the night of the accident, Defendant's train sounded four horn blasts, the first of which was initiated within 25 seconds of arriving at the Crossing, in compliance with 43 C.F.R. § 222.21(b)(2).  While the Parties dispute whether the first, second, and fourth horn blasts constitute "short" or "long" blasts under § 222.21(a), Defendant concedes that the 3.1 second duration of the third blast does not comply with the requirement in § 222.21(a) that the third horn blast be "short." (*See* Doc. 35-1 at 18-19).

Plaintiff's negligence claim fails as matter of law because the record evidence does not show that Defendant's non-compliance with the train horn regulation was the proximate cause of Mr. John's accident.  Plaintiff points to no evidence that Mr. John's accident and subsequent injury were the foreseeable result of Defendant sounding its third horn for a longer duration than the train horn regulation requires.  Rather, the evidence shows that, prior to the accident, Mr. Johns was familiar with the AMC Crossing and had discussed with Plaintiff the need to stop and exercise caution when driving through the Crossing.  As Defendant's train approached the AMC crossing, the headlight on the lead locomotive was burning, the ditch lights were flashing, and the train was travelling at approximately 39 miles per hour.  The engineer sounded the third horn blast longer than normal as a warning to Mr. Barnes, who was approaching the Crossing from the southbound lane on AMC Road. Nevertheless, testimony from Mr. Barnes, the eye witness, and video from the lead locomotive indicate that, upon reaching the warning signs near the rail across AMC Road,

Mr. Johns "casually proceeded" onto the Crossing less than 2 seconds before Defendant's train arrived.

As was the case in *Holstine v. National R.R. Passenger Corp.*, here "[Plaintiff] has not offered any credible evidence that blinking lights, ringing bells, or a different horn pattern would have made a difference when [Mr. Johns] seems to have ignored so many other warnings[,]" including a familiar crossing that featured a stop sign, stop bar and crossbuck. No. 3:14-CV-58-DPJ, 2015 WL 3766804, at *10 (S.D. Miss. Jun. 16, 2015). Thus, the record evidence demonstrates that Defendant's failure to comply with the federal horn regulation's long, long, short, long blast pattern was not the proximate cause of the injuries Mr. Johns suffered. *See Black*, 202 Ga. App. at 808, 415 S.E.2d 705 ("It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury.").

### D. Contributory Negligence

Defendant argues that it is entitled to summary judgment because "the negligence of [Mr.] Johns in failing to yield to the train was the sole cause, and certainly more than 50% responsible for the accident." (Doc. 35-1 at 30). In response, Plaintiff contends that "there is no evidence that Mr. Johns did not stop look or listen" before proceeding through the crossing and that "Defendant cannot offer evidence it exercised the appropriate degree and care in every regard." (Doc. 43-1 at 17 and 19). To the contrary, the record evidence demonstrates  that Defendant is entitled to summary judgment because Mr. John's failure to exercise ordinary care in pulling onto the AMC Crossing, not Defendant's alleged acts or omissions, were the sole proximate cause of Mr. Johns' injuries and thus bar recovery in this case.

O.C.G.A. § 46-8-492 creates a rebuttable presumption of a railroad company's negligence "whenever a person is injured on a railroad track by the running of locomotives. . . ." *Wall v. Southern R.R. Co.*, 196 Ga. App. 483, 484, 396 S.E.2d 266 (1990). "The presumption disappears, however, when the railroad company introduces evidence

showing the exercise of reasonable care and skill, that is, ordinary care, by its employees in the operation of the train at the time and place in question." (*Id.*) (internal citation and quotation marks omitted).   As discussed above in Section IV(B) Defendant's employees exercised reasonable care and skill in slowing the train, burning its headlight, flashing its ditch lights, and blowing the horn as the train approached the Crossing.   Furthermore, the employees kept an active watch on the area in front of the train.   Accordingly, the presumption is rebutted.

"In view of defendant's showing of ordinary care, it [is] up to plaintiff to show by the evidence that there remains a genuine issue for trial." *Houston v. Ga. Northeastern R. Co., Inc.* 193 Ga. App. 687, 388 S.E.2d 762 (1989) (citing O.C.G.A. § 9-11-56(e)).   Pursuant to O.C.G.A. § 46-8-291,

> No person shall recover damages from a railroad company for injury to himself or his property where the same is ... caused by his own negligence, provided that if the complainant and the agents of the company are both at fault, the former may recover, but damages shall be diminished by the jury in proportion to the amount of fault attributable to him.

"Questions as to diligence and negligence, including contributory negligence, being questions peculiarly for the jury, the court will decline to solve them ... except in plain and indisputable cases." *Wall*, 196 Ga. App. at 485, 396 S.E.2d 266.   Where a plaintiff's "failure to exercise reasonable care for [his] own safety is the direct and immediate cause of [his injury], which danger could have been avoided by her exercise of due care, the sole proximate cause of [his] injury was [his] contributory negligence." *Garrett v. NationsBank*, 228 Ga. App. 114, 119, 491 S.E.2d 158 (1997).

As discussed above, under Georgia law, Mr. Johns was required to stop no less than 15 feet of the railroad tracks on the night of the accident and to not proceed across the tracks if an approaching train was plainly visible and in hazardous proximity.   *See* O.C.G.A. §§ 40-6-141, 40-6-140.   This duty existed "regardless of whether or not [Mr. Johns] did in fact see [Defendant's approaching train]." *Decker v. State*, 217 Ga. App. 803, 459 S.E.2d 586 (1995) (emphasis in original) (citations omitted), cert. denied (1995).   "[B]efore it can be said in a given case that an approaching train was 'plainly visible' as a matter of law, it must

26

appear as a matter of law that a reasonably prudent person, situated as was the motorist and exercising ordinary care for his own safety should have seen it." *Mitcham*, 127 Ga. App. at 104, 192 S.E.2d 549 (citations omitted).  "Whenever a collision occurs it is necessary for the objects involved to have been in hazardous proximity to each other immediately prior thereto." *Mitcham*, 127 Ga. App. at 103, 192 S.E.2d 549.

Here, as discussed above, the "plain and indisputable" record evidence shows that the sole proximate cause of Mr. Johns' injury was his contributory negligence.  The undisputed evidence shows:

- The weather was clear at the time of the accident.

- The train's headlights were on, its ditch lights were flashing, and it sounded at least four horn blasts before crossing AMC Road at approximately 39 miles per hour.

- A motorist travelling north on AMC Road towards the crossing would have to pass a stop sign and stop bar approximately 38 feet from the near rail and a crossbuck installed by Defendant approximately 17 feet from the near rail.

- The motorist's view of a westbound train from the stop sign was unobstructed and plain for at least 300 feet.

- Prior to the accident, Mr. Johns was familiar with the AMC Crossing and had discussed with Plaintiff the need to exercise caution when proceeding across the tracks.

- After Ms. McCravy's vehicle stopped at the stop sign and crossed the railroad tracks, Mr. Johns was not observed stopping at the stop sign.  Instead he was seen "casually proceed[ing]" towards the rails.

But "[e]ven if it is presumed that [Mr. Johns] complied with his duty to look and listen [at the stop sign]—a finding [not supported] by the evidence—a reasonable trier of fact could only conclude that [Mr. Johns] entered the Crossing after he could have seen the approaching train." *Crockett v. Norfolk Southern Ry. Co.*, 95 F. Supp.2d 1353, 1361 (N.D. Ga. (2000) (citing *Wall*, 196 Ga. App. at 485-86, 396 S.E. 2d 266).  As such, "regardless of whether [Mr. Johns] stopped at the stop sign, he violated Georgia state law by proceeding through the crossing although Defendant's oncoming train was in hazardous proximity to

the Crossing, O.C.G.A. §§ 40-6-141, 40-6-140, and his resulting injuries were caused by his 'failure to exercise ordinary care for his own safety.'" *Crockett,* 95 F. Supp.2d at 1361-62 (citing *Dalton,* 133 Ga. App. 34, 38, 209 S.E.2d 669 (1974)).  Thus, as discussed above, Plaintiff fails to "show by the evidence that there remains a genuine issue for trial." *Houston,* 193 Ga. App. at 687, 388 S.E.2d 762.  Accordingly, Mr. Johns' contributory negligence bars Plaintiff's recovery of general damages, special damages, or costs.


**V.   Plaintiff's Punitive Damages Claim Fails as a Matter of Law**

Plaintiff alleges that a jury should determine if she may recover punitive damages for Defendant's alleged breach of its duty to "investigate and report dangerous conditions at a crossing to the government" and to "properly train its train crews on keeping a proper lookout."  (Docs 1 ¶ 30; 43-1 at 19-20).  It is well settled in Georgia that "negligence, even gross negligence, is inadequate to support a punitive damages award. . . . Something more than the mere commission of a tort is always required for punitive damages.  There must be circumstances of aggravation or outrage." *Lindsey v. Clinch Cty Glass, Inc.*, 312 Ga. App. 534, 535, 718 S.E.2d 806 (2011).

As a matter of law, no such circumstances exist here.  "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51–12–5.1(b).  The record is devoid of evidence of Defendant's "willful misconduct, malice, fraud, wantonness, oppression, or [] entire want of care [giving rise to] the presumption of conscious indifference to consequences."  O.C.G.A. § 51–12–5.1(b).  Accordingly, Plaintiff's punitive damages claim fails as a matter of law.

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment, (Doc. 35), is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment, (Doc. 25), and Motion to File a Surreply to Defendant's Reply in Support of its Motion for Summary Judgment, (Doc. 55), are **DENIED**.


**SO ORDERED**, this  28th  day of September, 2016.

                    /s/ Leslie J. Abrams
          **LESLIE J. ABRAMS, JUDGE**
          **UNITED STATES DISTRICT COURT**